FILED
2018 Jan-12  AM 11:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 22
## PART ONE

## DEFENDANTS' INITIAL SUMMARY JUDGMENT SUBMISSION

## JAMES SULLIVAN V. PJ UNITED, INC., *ET AL.*
## CASE#: 7:13-CV-01275

## INDEX

**Page Number**

Deposition of Nathanael Buchanan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1 - 27

1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2        FOR THE NORTHERN DISTRICT OF ALABAMA

 3               WESTERN DIVISION

 4

 5    JAMES SULLIVAN, et al.,

 6             Plaintiffs,

 7    vs.           CASE NO:  7:13-cv-01275-LSC

 8    PJ UNITED, INC.,

 9    DOUGLAS STEPHENS, et al.,

10             Defendants.

11

12           * * * * * * * * * *

13        DEPOSITION OF NATHANAEL BUCHANAN,

14    taken pursuant to stipulation and agreement

15    before Dana Gordon, Alabama Certified Court

16    Reporter, and Commissioner for the State of

17    Alabama at Large, at Galloway, Scott, Moss &

18    Hancock, 2200 Woodcrest Place, Suite 310,

19    Birmingham, Alabama, on August 1, 2017,

20    commencing at approximately 9:00 a.m.

21           * * * * * * * * * *

22

23

24

25
```

**Bain & Associates Court Reporting Services, Inc.**
**1-888-326-0594  depos@bainandassociates.com**

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

**Page 2**

```
 1              APPEARANCES
 2
 3  FOR THE PLAINTIFFS:
 4      WILLIAM L. BROSS
 5      Attorney at Law
 6      Heninger Garrison Davis
 7      2224 1st Avenue North
 8      Birmingham, Alabama  35203
 9      william@hgdlawfirm.com
10
11  FOR THE DEFENDANTS:
12      WILLIAM K. HANCOCK
13      Attorney at Law
14      Galloway, Scott, Moss & Hancock
15      2200 Woodcrest Place
16      Suite 310
17      Birmingham, Alabama  35203
18      will.hancock@gallowayscott.com
19
20
21
22
23          * * * * * * * * * * *
24
25
```

**Page 4**

```
 1    EXHIBIT INDEX
 2    PAGE:
 3
 4  Exhibit 1  Employee Maintenance      15
 5  Exhibit 2  Consent to Join           16
 6  Exhibit 3  Pay Stubs                 17
 7  Exhibit 4  Team Member Checkout      35
 8    Reports
 9  Exhibit 5  Team Member Checkout      36
10    Reports
11  Exhibit 6  Team Member Checkout      36
12    Reports
13  Exhibit 7  Discovery Requests        38
14  Exhibit 8  Summary                   48
15  Exhibit 9  2013, '14, and '15        48
16    calendars
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1    EXAMINATION INDEX
 2    PAGE:
 3  EXAMINATION BY MR. HANCOCK      7
```
```
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1    STIPULATIONS
 2  It is hereby stipulated and agreed by
 3  and between counsel representing the parties
 4  that the deposition of NATHANAEL BUCHANAN is
 5  taken pursuant to stipulation and agreement;
 6  that all formalities with respect to
 7  procedural requirements are waived; that
 8  said deposition may be taken before Dana
 9  Gordon, Alabama Certified Court Reporter,
10  and Commissioner for the State of Alabama at
11  Large, without the formality of a
12  commission; that objections to questions
13  other than objections as to the form of the
14  questions need not be made at this time but
15  may be reserved for a ruling at such time as
16  the deposition may be offered in evidence or
17  used for any other purpose as provided for
18  by the Federal Rules of Civil Procedure.
19  It is further stipulated and agreed
20  by and between counsel representing the
21  parties that the filing of the deposition is
22  hereby waived and that the deposition may be
23  introduced at the trial of this case or used
24  in any manner by either party hereto
25  provided for by the Statute.
```

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 002

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

Page 6

1 It is further stipulated and agreed
2 by and between the parties hereto and the
3 witness that the signature of the witness to
4 this deposition is hereby waived.
5      * * * * * * * * * * * * *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1      NATHANAEL BUCHANAN
2 The witness, having first been duly
3 sworn to speak the truth, the whole truth
4 and nothing but the truth, testified as
5 follows:
6     THE REPORTER: Usual
7 stipulations?
8     MR. BROSS: Yeah.
9     MR. HANCOCK: Sure.
10    EXAMINATION
11 BY MR. HANCOCK
12 Q.  Could you state your name for the
13   record, please?
14 A.  Nathanael Buchanan.
15 Q.  Can you spell your first name?
16 A.  N-A-T-H-A-N-A-E-L.
17 Q.  Thank you.
18    Where do you live?
19 A.  Newport News, Virginia.
20 Q.  What year were you born?
21 A.  1989.
22 Q.  And so you would have turned 16
23   in 2005?
24 A.  Yes, sir.  Sorry.
25    MR. BROSS: It's too early for

Page 8

1    that.
2      THE WITNESS: Exactly.
3      BY MR. HANCOCK:
4 Q.  What year did you get your
5   driver's license?
6 A.  My driver's license would have
7   been 2008.  Yeah.
8 Q.  You waited till you were --
9 A.  I --
10 Q.  How old were you?
11 A.  I had just turned 18.
12 Q.  Why didn't you get your driver's
13   license when you were 16?
14 A.  It just wasn't very convenient.
15 Q.  Has your driver's license ever
16   been suspended or revoked?
17 A.  Not to my knowledge.
18 Q.  What kind of car did you start
19   driving after you got your driver's license?
20 A.  When I first started delivering,
21   it was a 1990 Buick Park Avenue.
22 Q.  So you said "delivering."  What
23   do you mean by delivering?
24    And I'm going to ask you some
25   questions --

Page 9

1 A.  Oh --
2 Q.  Let me interrupt you.
3    I'm going to ask you some
4 questions that probably everybody knows the
5 answer to, but we're trying to get your --
6 the question and the answer typed into the
7 record.
8 A.  Correct.  Yes, sir.
9    When I first started delivering,
10 it was not long after I had gotten my
11 driver's license, and that was the car.  But
12 that would have been back in 2008, which I
13 believe was before this was --
14 Q.  So you started -- let's just make
15 sure we're all talking about the same thing.
16 Delivering for Papa John's?
17 A.  Yes, sir.
18 Q.  So you started delivering for
19 Papa John's --
20 A.  I --
21 Q.  -- around 2008?
22 A.  I believe it was 2008, yes, sir.
23 Q.  And another thing that we both
24 need to be mindful of for Dana's benefit is
25 not trying to talk over each other.  If you

Page 10

1   will try to let me finish my question, and I
2   will try to let you finish your answer.  It
3   makes it a lot easier for her to type.
4      If you could hear her play back
5   the exchange we just had, I would say a
6   word, you would say a word; I would say a
7   word, you would say a word.  It's absolutely
8   the way we talk in ordinary life.  So
9   don't -- I am not scolding you.  I'm
10  scolding myself more because I should know
11  better, but to be polite and helpful to her,
12  if we could be mindful of that, I would
13  appreciate it.
14  A.  Yes, sir.  Sorry.
15  Q.  Don't apologize.  Everyone does
16  it.  It's just one of those things that I as
17  the person taking the deposition need to be
18  mindful of in helping you help her.
19  A.  Gotcha.
20  Q.  All right.  So have you ever
21  heard of Papa John's -- excuse me.  PJ
22  United?
23  A.  Yes, sir.
24  Q.  Not in a legal sense, and if you
25  get this wrong, you're in trouble.  Do you

Page 11

1   know what PJ United is?
2   A.  I believe it was the name for one
3   of the franchises of Papa John's.
4   Q.  Have you ever heard of PJ Cheese?
5   A.  Yes, sir.
6   Q.  Do you know what PJ Cheese is?
7   A.  PJ Cheese was the franchise that
8   I worked for.
9   Q.  And I take it, in your mind,
10  there is some connection between PJ Cheese
11  and PJ United?
12  A.  I believe so, yes, sir.
13  Q.  Do you know that those two are
14  separate entities from the franchisor in
15  Louisville or wherever they are that you --
16  the big Papa John's?
17  A.  Oh, of the complete corporate
18  entity?
19  Q.  Right.  The analogy I use a lot
20  of times is we all know McDonald's doesn't
21  own and operate every store on the side of
22  the road.
23  A.  Oh, correct.
24  Q.  But they use the same name.
25  That's the whole idea behind a franchise is

Page 12

1   that commonality.
2      Unless it's very clear in the
3   context, when I refer to Papa John's, I'm
4   referring to PJ United, PJ Cheese, the
5   company that provided you employment in
6   Virginia, which is not the big franchisor.
7   Does that make sense?
8   A.  Yes, sir.
9   Q.  Okay.
10  A.  I understand that.
11  Q.  And the reason is the company you
12  worked for uses the trade name Papa John's.
13  A.  Correct.
14  Q.  So just to make sure we're on the
15  same page.
16      So you say you started working
17  for Papa John's in 2008?
18  A.  It was actually 2006 that I
19  started working for the company.
20  Q.  When you were 19?
21  A.  No.  2006, right before I turned
22  17.
23  Q.  Oh, you were working -- not as a
24  driver?
25  A.  I worked inside for some time,

Page 13

1   and then I delivered for a short time in
2   2008.
3   Q.  So you said "delivered for a
4   short time."  What happened at the end of
5   that short time?
6   A.  I actually started managing.  And
7   I had gone into management for about a year,
8   a little less than.  I left the company to
9   go work for a friend of mine, and then it
10  was 2010 that I was rehired by the company.
11  Q.  When you were managing, were you
12  an hourly assistant?
13  A.  I was a salaried assistant.
14  Q.  As a salaried assistant, were you
15  familiar with checkout reports?
16  A.  Yes, sir.
17  Q.  What store did you work at?  Did
18  you work at the same Papa John's store --
19  A.  No.  It was actually nine
20  different locations that I worked at.  While
21  I was delivering from 2010 onward, it was
22  primarily two different locations that I was
23  at.
24  Q.  Were all nine stores in the
25  Newport News area?

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

Page 14

1  A.  They were in the general area.
2  It's Newport News, Hampton, and
3  Williamsburg.
4  Q.  In Papa John's parlance, is that
5  referred to as the Hampton Roads market?
6  A.  Yes, sir.
7  Q.  All right.  So let's draw a
8  line -- 2010, you say you came back to work
9  for Papa John's in Hampton Roads; is that
10  correct?
11  A.  Yes, sir.
12  Q.  And in what capacity did you come
13  back to work?
14  A.  As a delivery driver.
15  Q.  Why did you not -- were you not
16  interested in any management position?
17  A.  Not at that time.
18  Q.  Not holding you to it at all, but
19  do you know about when you came back in
20  2010?  Would it have been maybe around May?
21  A.  That does sound about right, yes,
22  sir.
23  Q.  And you worked as a -- you
24  applied as a part-time regular?
25  A.  Yes, sir.

Page 15

1  Q.  Did you work as a part-time
2  regular driver?
3  A.  I believe it pretty quickly ended
4  up as full time.  I would say within the
5  first couple of months.
6  Q.  How would you define full time?
7  A.  35 to 40 hours a week.
8  Q.  How would you define part time?
9  A.  Anything less than that.
10  Q.  Did you remain -- you say you
11  pretty soon became full time.  Can we just
12  say within -- because it doesn't matter,
13  within a couple of months?
14  A.  Oh, absolutely, yes, sir; within
15  a couple of months.
16  Q.  Once you became a full-time
17  driver, did you remain a full-time driver
18  until the end of your employment?
19  A.  There was a short stretch -- I'm
20  trying to think.  I want to say it was 2013,
21  maybe two or three months where I had gone
22  back into management, and then due to health
23  issues, I had to go back down.
24  (Exhibit No. 1 was marked for
25  identification.)

Page 16

1  Q.  Let me show you a document that
2  appears to reflect the starting and end
3  dates of your employment with Papa John's
4  that started in 2010.  Does that information
5  seem to be correct?
6  A.  It looks like it, yes, sir.
7  (Exhibit No. 2 was marked for
8  identification.)
9  Q.  Is that your signature on Exhibit
10  2?
11  A.  Yes, sir.
12  Q.  What was your intent when you
13  signed Exhibit 2?
14  A.  To join the class action was to
15  get any wages that I should have been paid.
16  Q.  Do you think there were wages
17  that were not paid to you that should have
18  been paid to you?
19  A.  I don't feel like the
20  compensation for mileage was fully paying
21  for my gas or the upkeep on the vehicle.
22  Q.  Do you have any records that
23  would show that disparity?
24  A.  Unfortunately, I didn't keep very
25  good maintenance records.

Page 17

1  (Exhibit No. 3 was marked for
2  identification.)
3  Q.  Let me show you what I have
4  marked as Exhibit 3, which I'll represent
5  are duplicate pay stubs with a check date
6  range of January 14, 2013 through -- the
7  last check date is July 13, 2015.  Do those
8  appear to be duplicate copies of your check
9  stubs for those check date ranges?
10  And it's not a trick question.
11  It's just getting it on the record.
12  MR. BROSS:  Yeah.
13  A.  Sorry.  Yes, sir, they do.
14  BY MR. HANCOCK:
15  Q.  Well, I don't want to hurry you,
16  but --
17  A.  No.  I mean, it looks to be about
18  the same as I remember them looking.
19  Q.  In just thumbing through, it
20  looks like you were working closer to
21  between 25, 26 weeks combined in-store and
22  on the road.  Can you just thumb through and
23  see --
24  A.  I'm sorry?
25  Q.  It looks like you were working

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 005

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

Page 18

1 closer to -- between 25 and 30 hours a week
2 when you combine the driver in-store and
3 on-the-road hours. And it's not a math
4 test. It's just more of a bird's-eye view
5 question.
6    MR. BROSS: And if you remember
7 what you were working, that's fine.
8 A. I mean, it's possible for some of
9 those weeks. I don't recall the exact
10 number of hours I would have worked. I
11 thought it was closer to full time, but I
12 mean, I'm sure some of those weeks was a bit
13 less.
14    BY MR. HANCOCK:
15 Q. The number of hours that you
16 would drive on a week to -- well, let me
17 back up.
18    Do you know what the -- what Papa
19 John's workweek was, whether it was Monday
20 through Sunday?
21 A. Oh, yes, it was Monday through Sunday,
22 yes, sir.
23 Q. And I want to restrict my
24 questions going forward, unless otherwise
25 stated, to the post 2010 period when you

Page 20

1 approval being clocked in from there.
2    As far as the process of logging
3 out a delivery, it would be simply going to
4 the delivery screen that had the list of all
5 the runs and highlighting the delivery -- I
6 guess it was picking my name out of the
7 list, putting the delivery -- you know,
8 assigning it with a button press, and it
9 would -- if it was more than two deliveries
10 on a run, then that would also take
11 management approval in order to log out as
12 far as a manager using their password to
13 assign the delivery.
14 Q. Different people use different
15 phrases, but the vast majority of people
16 that I've talked to discuss a run as being
17 the process of leaving the store and
18 returning to the store. And within that
19 run, there could be a single delivery, which
20 is a discrete address, or two deliveries.
21 Is that the way you're thinking of things,
22 deliveries and runs?
23 A. That is correct, yes, sir.
24 Q. Some people would refer to a
25 two-pie run if there were two different

Page 19

1 were working as a delivery driver.
2 A. Sure.
3 Q. Can you tell me the procedure you
4 would go through once you came to work in
5 terms of clocking in and then clocking out
6 to drive and back in and so forth?
7 A. Oh, yes, sir. When I arrived for
8 my shift, I would type in my information; my
9 log-in number and password. It would take
10 manager approval to clock in as a delivery
11 driver, and then --
12 Q. What does that mean?
13 A. Oh, essentially, a manager would
14 have to input their password to fully clock
15 me in for the shift.
16 Q. Would you use a thumbprint or
17 anything?
18 A. The last maybe year, two years
19 that I was there, we had switched to
20 thumbprint recognition, which I don't recall
21 if it needed manager approval to clock in
22 after that or not. But after we switched to
23 thumbprint readers, it was simply pulling up
24 the log-in screen, putting a thumbprint on
25 it, and then whether or not I needed manager

Page 21

1 deliveries -- addresses?
2 A. Yes, sir.
3 Q. Did you ever call it a two-pie?
4 A. I normally called it a double.
5 Q. Different people have different
6 nicknames, but the concept is the same.
7 Predominantly, a delivery would be to a
8 single -- a run would be a delivery to a
9 single discrete address, sometimes a
10 delivery include a second and possibly
11 even a third delivery address?
12 A. Yes, sir.
13 Q. Reimbursement you received for
14 the use of your car from Papa John's was
15 based on the discrete address, a per
16 delivery discrete address rate; is that
17 correct?
18 A. Yes, sir.
19 Q. Does Virginia require drivers to
20 have a minimal -- minimum level of liability
21 insurance?
22 A. Virginia does, yes, sir.
23 Q. And you never drove for Papa
24 John's outside of Virginia, did you?
25 A. No, sir.

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 006

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

---

Page 22

1  Q.  Has there been any point in your
2  life after you got your driver's license
3  that you did not maintain at least the
4  Virginia required minimum level of liability
5  insurance?
6  A.  No, sir.
7  Q.  And you purchased that insurance
8  for your benefit so you can operate a motor
9  vehicle in the state of Virginia; is that
10  correct?
11  A.  Yes, sir, but also in order to
12  work, I needed that insurance.
13  Q.  But you can't get to work -- you
14  can't drive your car to work unless you got
15  the insurance, right?
16  A.  I wouldn't have been able to get
17  to work, but I also wouldn't have been able
18  to do that work without the insurance.
19  Q.  Did you ever maintain insurance
20  at a level higher than -- let me strike
21  that -- or rephrase it.
22      Can I just call your second
23  period of employment the second stint of
24  employment or --
25  A.  Sure.

---

Page 23

1  Q.  So during the second stint of
2  your employment with Papa John's, did you
3  ever purchase insurance in an amount that
4  exceeded the State of Virginia minimum
5  level?
6  A.  Yes, sir.
7  Q.  What insurance did you purchase?
8  A.  I had full coverage on my car.
9  Q.  And what car did you drive for --
10  while you were employed in the second stint
11  of your employment?
12  A.  The 2008 Honda Fit.
13  Q.  What did you drive before you
14  drove the Honda Fit?
15  A.  I believe it was a 2005 Dodge
16  Neon, but that car was gone before I came
17  back to work at Papa John's.
18  Q.  What happened to the Neon?
19  A.  It was totaled.  I was sitting at
20  a red light, and someone hit me from behind.
21  Q.  Is that why you bought the Honda
22  Fit?
23  A.  Yes, sir.
24  Q.  So you didn't buy the Honda Fit
25  because of Papa John's, did you?

---

Page 24

1  A.  No, sir.
2  Q.  Did you finance the Honda Fit?
3  A.  I did not.
4  Q.  Were you still driving the Honda
5  Fit when your employment with Papa John's
6  ended?
7  A.  Yes, sir.
8  Q.  And throughout the entire
9  employment period, did you elect to maintain
10  insurance on -- elect to maintain full
11  coverage on the Fit?
12  A.  Yes, sir.
13  Q.  Papa John's didn't require you to
14  purchase full coverage on the Fit, did it?
15  A.  Full coverage?  I don't believe
16  so, no, sir.
17  Q.  What insurance company insured
18  the Fit?
19  A.  For most of my time -- actually,
20  I believe it was for all of that time.  I
21  was with Nationwide.  I believe it was after
22  I left that I switched to GEICO.
23  Q.  Do you know what your premium was
24  for the Honda Fit?  This is not --
25  A.  Yeah.

---

Page 25

1  Q.  -- time to guess.  Okay?
2  A.  I was paying on a six-month
3  period, so I'm not sure what the exact
4  amount was, no, sir.
5  Q.  You paid six months at a time?
6  A.  Yes, sir.
7  Q.  Do you know how much the Virginia
8  minimum was in relation to the entire
9  premium?  Was it segregated out?
10  A.  I'm sorry?
11  Q.  When you paid your premium, did
12  Nationwide separate out the charges for
13  different coverages such as X amount for
14  minimum liability, Y amount for additional
15  full coverage?
16  A.  It's possible that it was broken
17  down somewhere like that, but I just paid
18  one amount.
19  Q.  And you don't --
20  A.  So I'm not sure if they had it
21  separated that way or not.
22  Q.  Is the Honda Fit registered in --
23  to be driven in Virginia?
24  A.  Yes, sir.
25  Q.  Has it always been registered?

---

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 007

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

Page 26

1  A.  Yes, sir.
2  Q.  And that's for the benefit of
3     that car being legally operable in Virginia?
4  A.  Yes, sir.
5  Q.  And you would register the Fit
6     regardless of whether you worked at Papa
7     John's; is that correct?
8  A.  I would yes, yes, sir.
9  Q.  You can't drive the Fit in
10    Virginia unless it's registered and
11    minimally insured; is that correct?
12 A.  Correct.
13 Q.  And you derive personal benefit
14    from driving the Fit in Virginia, don't you?
15 A.  Personally and professionally,
16    yes, sir.
17 Q.  Did you work anywhere else while
18    you were working in the second stint at Papa
19    John's?
20 A.  No, sir.
21 Q.  Did you go to school?
22 A.  I did not.
23 Q.  Are you married?
24 A.  No, sir.
25 Q.  Have you ever been married?

Page 27

1  A.  No, sir.
2  Q.  So you've checked in.  You've got
3     management approval to check in as a driver.
4     Do drivers get in line?  How are drives
5     assigned -- deliveries assigned?
6  A.  It would be in a rotation as far
7     as the first driver who had arrived at the
8     store would be the first driver to leave on
9     a delivery, and the driver who had come back
10    from a delivery next would be the next one
11    up.
12 Q.  So it's just a moving line.  You
13    get in line as you show up for work, and you
14    get in the back of the line when you come
15    back from a delivery?
16 A.  Yes, sir.
17 Q.  Do drivers have input as to which
18    deliveries they would take?
19 A.  Not really, no, sir.  It was
20    usually just assigned in the order they came
21    out of the oven.
22 Q.  What about input as to whether
23    there would be two deliveries on a run?
24 A.  I'm sure plenty of drivers
25    suggested it, but primarily, it was up to

Page 28

1     management.
2  Q.  Why would a driver suggest two
3     deliveries?
4  A.  Hoping to make more tips.
5  Q.  So driving is about the tips,
6     isn't it?
7  A.  Usually, yes, sir.
8  Q.  I mean, there are a lot of --
9     what was your hourly wage rate while you
10    were working the second stint at Papa
11    John's?
12 A.  Okay.  So that was -- while I was
13    in the store, it was $8 an hour.  Anytime I
14    was on the road for a delivery, meaning
15    logged out on a delivery, I was being paid
16    $4 an hour.
17 Q.  That's $4, quote, cash in a
18    paycheck; is that right?
19 A.  Yes, sir.
20 Q.  And you made $8 an hour
21    throughout your second stint at Papa John's?
22 A.  Correct.
23 Q.  Do you understand what a tip
24    credit is?
25 A.  I believe I have a pretty good

Page 29

1     understanding of it.
2  Q.  And again, this is not a quiz on
3     the law.  Just explain to me for the record
4     what your understanding of the tip credit
5     was.
6  A.  The tip credit was -- I guess
7     with the compensation they were giving us
8     for taking deliveries, it was to try to
9     elevate that lower $4 pay rate up to the
10    minimum wage.
11 Q.  You said in addition to what they
12    gave you for deliveries.
13 A.  The mileage.
14 Q.  Mileage was not a component of
15    your pay stub, was it?
16 A.  No, sir.
17 Q.  The mileage payment was separate
18    and distinct from payroll; is that right?
19 A.  From the overall payroll, I
20    believe so, yes, sir.  It was kept on file
21    in the computer, I know, how much -- I don't
22    know if they've saved them since I've been
23    gone.  But it was logged as far as -- at the
24    end of a shift, the management would put in
25    the number of miles that they were

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 008

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

Page 30

1  essentially saying that we had delivered on
2  that shift.  And it was -- but it was per
3  delivery that we were given a mileage.
4  Q.  Is it your understanding that
5  your -- your wage rate was $8 an hour during
6  your second stint at Papa John's?
7  A.  While in-store, yes, sir.
8  Q.  And did Papa John's claim a
9  credit against an $8 rate -- $8 wage for the
10  first $4 of tips you received each hour?
11  A.  I would imagine so.
12  Q.  If in a workweek you did not
13  average at least $4 an hour in tips, would
14  Papa John's make up the difference?
15  A.  That's what I was told, yes, sir.
16  Q.  Was there ever a week when you
17  didn't average at least four hours in tips?
18  Q.  And when I say average in tips, I'm talking
19  about when you're driving, just for the
20  hours on the road.
21  A.  For the entire shift, I don't
22  believe there ever was.
23  Q.  Have you ever heard of the
24  concept of minimum wage makeup?
25  A.  It sounds like a familiar term.

Page 31

1  Q.  Is it your understanding that if
2  you had not received $4 an hour in tips
3  while driving in a workweek, Papa John's
4  would have made up the difference to you to
5  $8?
6  A.  Oh, yes, sir.
7  Q.  But you kept -- you retained all
8  tips, right?
9  A.  Correct.
10  Q.  And we've done this drill with a
11  lot of folks, but -- so you check out on a
12  run.  You come back.  Did you have a little
13  box that you put cash and receipts in --
14  A.  Yes, sir.
15  Q.  -- with your name on it, and that
16  was just your work in progress for the day?
17  A.  Yes, sir.
18  Q.  At the end of the day, was there
19  a checkout process?
20  A.  Yes, sir.
21  Q.  Explain the checkout process.
22  A.  The checkout process would be a
23  manager would essentially pull up a screen
24  showing -- I think you might have some --
25  the list of the deliveries I had taken that

Page 32

1  day and the total amounts of money as far as
2  credit card payments or cash payments for
3  the day.
4  Q.  (Indicating.)
5  A.  Yes, sir, just like that.
6  Q.  And you're referring to the Papa
7  John's Team Member Checkout Report?
8  A.  Yes, sir.
9  Q.  So you already had all your cash
10  tips?
11  A.  Yes, sir.
12  Q.  Did Papa John's convert credit
13  and debit card tips to cash?
14  A.  Yes, sir.
15  Q.  And in addition, they gave you a
16  cash component payment -- amount of money
17  for the use of your car during that shift;
18  is that correct?
19  A.  Oh, the -- of the mileage, yes,
20  sir.
21  Q.  Right.
22      And the mileage money was not
23  based on the actual mileage you drove, was
24  it?
25  A.  No.  It was normally -- I believe

Page 33

1  they credit it as 5 miles per delivery even
2  if it was a little bit less or more.
3  Q.  Was that $5 -- you're saying
4  there was a $5 assumption?
5  A.  Oh, no, no.  The mileage amount
6  that they input into the computer was that
7  each delivery we took was 5 miles.
8  Q.  That's 5 miles there and back
9  again?
10  A.  5 miles total.
11  Q.  And would that -- was that about
12  the average distance of a delivery?
13  A.  I believe it was -- it was
14  roughly that, yes, sir.
15  Q.  You know, within maybe 10
16  percent, 5 percent?
17  A.  I would guess somewhere around 10
18  percent, yes, sir.
19  Q.  And does that 5 mile number
20  include the occasional double delivery?
21  A.  It was 5 miles for each
22  individual delivery, yes, sir.
23  Q.  Right.
24      So if you drove 2.4 -- if you did
25  a double and you -- the first address was

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 009

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

**Page 34**

1  2.4 miles from the store and the second
2  delivery happened to be the next-door
3  neighbor, you would essentially have driven
4  4.8, 4.9 miles and gotten 10 miles, 2
5  deliveries?
6  **A. Oh, yes, sir.**
7  Q.  Although, that's not really how
8  it worked.  It was just an average, right?
9  **A. Correct.**
10  Q.  So is it your belief that the --
11  that doubles were sort of baked into that
12  number on average?
13  **A. I'm sorry?**
14  Q.  A single delivery is going to
15  vary from address to address, correct?
16  **A. Correct.**
17  Q.  And a double delivery is going to
18  vary from address to address to address?
19  **A. Oh, yes, sir.**
20  Q.  On average, recognizing that
21  during a single run you may get 2
22  deliveries, is 5 miles about the average
23  total number of miles there and back again
24  for a delivery?
25  **A. Yes, sir, I believe so.**

**Page 35**

1  Q.  When you say that 5 miles was
2  keyed in --
3  **A. I believe they have it right here**
4  **on the Team Member Checkout Report of total**
5  **miles driven.  They actually have it at the**
6  **top of that page the total number of orders.**
7  Q.  Right.  I'm just double-checking.
8    All right.  So can you show me --
9  I want to mark this as Exhibit 4, which are
10  Team Member Checkout Reports with a begin
11  date of January 1, 2013 and an end date of
12  December 30, 2013.  Does that look correct?
13  **A. Yes, sir.**
14    **(Exhibit No. 4 was marked for**
15    **identification.)**
16  Q.  Where is Store 448?
17  **A. It's on Jefferson Avenue in**
18  **Newport News.**
19  Q.  Is the Jefferson Avenue store the
20  store you predominantly worked at in 2013,
21  '14, and '15?
22  **A. Yes, sir.**
23  Q.  Did you ever work at any other
24  stores during that three-year period?
25  **A. During that three-year period?**

**Page 36**

1  It's possible that I worked at the J. Clyde
2  Morris store, but I don't believe so after
3  that point.
4  Q.  But if you worked at J. Clyde, it
5  would have been a day or two?
6  **A. Usually, yeah.  Oh, there may**
7  **have been periods of one or two days a week**
8  **for stretches, but primarily, it was just**
9  **the Jefferson Avenue location.**
10    **(Exhibit Nos. 5 and 6 were marked**
11    **for identification.)**
12  Q.  I have marked as Exhibit 5
13  checkout reports with a begin date of
14  January 1, 2014 and an end date of December
15  13, 2015 -- excuse me.  '14.
16    **MR. BROSS: '14.**
17    **MR. HANCOCK: Thank you, Bill.**
18    **BY MR. HANCOCK:**
19  Q.  And Exhibit 6 is checkout reports
20  with a begin date of January 2, 2015 and an
21  end date of June 30, 2015.
22    So if you will look at Exhibit
23  3 -- the checkout reports, Exhibits 4, 5,
24  and 6, are -- the form is all the same,
25  right?

**Page 37**

1  **A. Correct.**
2  Q.  So tell me about the 5 miles of
3  delivery in the field where it shows the
4  total number of deliveries.
5  **A. Well, there is -- for example, on**
6  **the January 1st sheet here, Total Orders is**
7  **21, and then over here at "Total Miles**
8  **driven," the manager would have logged it in**
9  **as about 5 miles per delivery.  So they have**
10  **it logged as 105 miles that I traveled that**
11  **day.**
12  Q.  So just for reference in the
13  record, Total Orders of 21 is the total
14  discrete delivery addresses listed on that
15  checkout report?
16  **A. Correct.**
17  Q.  So for at least your purposes,
18  Total Orders is total discrete deliveries
19  for the day, correct?
20  **A. Correct.**
21  Q.  And then the middle column,
22  there's -- about the top third of the page,
23  at the head of the second block of data,
24  there's an entry called "Total miles
25  driven."  And on this checkout report,

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 010

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

Page 38

1 January 1, 2012, in Exhibit 4, the total is
2 105 miles, which is only a multiplier of
3 5 -- a standard 5 times the total orders?
4 A. Correct.
5 Q. Do you know who came up with the
6 number 5 as the multiplier?
7 A. I do not.
8 Q. Was 5 the multiplier to be used
9 with total orders during your second stint
10 of employment?
11 A. Yes, sir.
12 Q. So 5 would be the multiplier to
13 come up -- to combine with Total Orders to
14 get the Total miles driven in Exhibits 4, 5,
15 and 6; is that correct?
16 A. It should be, yes, sir.
17 Q. But the total miles driven bears
18 no relation to the actual miles driven, does
19 it?
20 A. I don't believe so.
21 Q. But you didn't keep actual miles,
22 did you?
23 A. Not usually, no, sir.
24    (Exhibit No. 7 was marked for
25    identification.)

Page 39

1 Q. Let me show you what I have
2 marked as Exhibit 7. Tell me if you
3 recognize that document.
4 A. Yes, sir. It looks like the
5 discovery requests or --
6 Q. Yes, they're discovery requests.
7 A. Yeah.
8 Q. And the discovery requests
9 contain 22 questions; is that correct?
10 A. Yes, sir.
11 Q. In the legal world, a discovery
12 request in the form of a question is called
13 an interrogatory.
14 A. Okay.
15 Q. Think interrogate. Right?
16    So there are 22 interrogatories;
17 is that right?
18 A. Yes.
19 Q. On the fourth page of Exhibit 7,
20 your name is typed.
21 A. Yes, sir.
22 Q. Did you type the responses to
23 these interrogatories?
24 A. Yes, sir.
25 Q. Did you do it on a writable PDF?

Page 40

1 A. Yes, sir.
2 Q. And then on the fifth page, is
3 that your signature?
4 A. Yes, sir. And then below that is
5 my printed name as well.
6 Q. And the black box is your
7 address, which we redact for privacy
8 purposes.
9 A. Okay.
10 Q. And that's why there's -- there
11 are things blacked out on the pay stubs,
12 like your address and Social Security
13 number.
14 A. Oh, that makes sense.
15 Q. With regard to the
16 interrogatories, a number of the
17 interrogatories don't have an answer.
18 They're blank. Is that because you don't
19 know the response?
20 A. If I didn't recall, I tried to
21 leave it empty, or if it was a no, then I
22 would leave it empty. I believe primarily
23 they were all just because I couldn't
24 remember the exact amount or even a good
25 estimate.

Page 41

1 Q. So to me, there's a difference
2 between "I don't know" and an affirmative
3 "no." Is there any blank that you intended
4 to be an affirmative no?
5    For example, if somebody were to
6 ask me in an interrogatory can I dunk a
7 basketball, there would be a big difference
8 between "No, I can't" and "I don't know if I
9 can."
10 A. Looking at these -- okay. All
11 the ones I left blank were because I wasn't
12 sure. The only ones that were a no were the
13 two that I marked "N/A."
14 Q. And those are Interrogatories 21
15 and 22?
16 A. Correct.
17 Q. So all other blanks on the
18 interrogatories is because, under oath, you
19 cannot provide a response?
20 A. I couldn't definitively say what
21 the amount was.
22 Q. You couldn't give a reasonable
23 guess, could you?
24 A. For most of them, probably not.
25 Q. On Interrogatory 10 -- well, let

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594  depos@bainandassociates.com

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 011

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

Page 42

1 me -- let's get back to the checkout
2 reports.
3      At the top right of the checkout
4 reports, there's a column that says "Mileage
5 Rate." And on the first page of Exhibit 4
6 for January 1, 2013, the Mileage Rate is
7 $1.05. Do you know what the $1.05 is?
8 A. That was the amount paid per
9 order that I delivered for that shift.
10 Q. Okay. So there's also a Reg
11 Mileage entry on the top left corner, and on
12 the first page of Exhibit 4, which is a
13 January 1, 2013 checkout report, the Reg
14 Mileage is $22.05. Do you know how that
15 number is arrived at?
16 A. That would be the total orders of
17 21 multiplied by the $1.05 mileage rate.
18 Q. So 21 times 1.05 is 22.05; is
19 that correct?
20 A. Yes, sir.
21 Q. And so the Reg Mileage is the
22 amount in cash you were given at checkout
23 each day when you checked out at the end of
24 the shift to reimburse you for the use of
25 your vehicle; is that correct?

Page 43

1 A. Yes, sir.
2 Q. And the mileage rate changed,
3 didn't it?
4 A. Yes, sir.
5 Q. Do you know why or when it
6 changed?
7 A. We were told, at least from
8 management, that it was fluctuating based on
9 local gas prices and an average from that.
10 It was supposed to be changed, I believe,
11 after a month, but there were a number of
12 months that it wasn't changed.
13 Q. Is it possible that the gas price
14 didn't change that month?
15 A. That would be possible, yes, sir.
16 Q. Looking at Interrogatory 10 on
17 Exhibit 7, you're asked -- well, what's your
18 understanding of the question that was posed
19 in Interrogatory 10?
20 A. Just how much gas I spent per
21 week to take those deliveries.
22 Q. And that's not including gas
23 driving to or from work, correct?
24 A. Correct.
25 Q. And not including gas for any

Page 44

1 other purpose, right?
2 A. Correct.
3 Q. How did you come up with the
4 number 35?
5 A. I believe on average, I was
6 filling up, which was around $20, twice a
7 week. So took away a little bit for other
8 mileage throughout the week. That seemed to
9 be my best guess for that.
10 Q. So 35 is a best guess?
11 A. Yes, sir.
12 Q. And that's a best guess -- is
13 that an approximate amount, 35?
14 A. Approximate? Yes, sir.
15 Q. Is that an average over all the
16 workweeks in 2013, '14, and '15 that you
17 worked?
18 A. I would say that's probably
19 correct.
20 Q. In fact, the amount of gas that
21 you actually consumed to deliver for Papa
22 John's during a workweek would vary based on
23 the number of days worked, the number of
24 deliveries, and the distances of the
25 deliveries; is that correct?

Page 45

1 A. Correct.
2 Q. Would that best guess average
3 estimate of $35 spent on gas likely be
4 smaller in workweeks in which you worked
5 fewer than average days?
6 A. I would imagine so, yes, sir.
7 Q. During the second stint of your
8 employment -- let's just say for the years
9 2013, '14, and '15, what was your normal
10 work schedule?
11 A. I know I worked five days a week.
12 It would fluctuate, though. There would be
13 some weeks where I would work, say, open
14 from 9:30 a.m. until 5:00 p.m. or even
15 later; and other weeks, I would work from
16      5:00 p.m. until 11:00 or 12:00 p.m. And I'm
17 sure there were -- there were also a number
18 of days where I worked 4:00 p.m. to
19      8:00 p.m.
20 Q. But typically, you would work
21 five days a week?
22 A. Yes, sir.
23 Q. And how many hours -- five days
24 or five shifts are the same thing, right?
25 A. Correct.

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 012

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

Page 46

1 Q.  What was the typical length of a
2 shift?
3 A.  Typical length of shift, as I
4 said, kind of fluctuated because there were
5 some days even in the same week where I
6 would work 9:30 until 5:00, other days where
7 I worked 5:00 until midnight; or, you know,
8 one day a week, I worked 4:00 to 8:00 or
9 anything in between.
10 Q.  Why did you work at Papa John's
11 as a delivery driver rather than working
12 some other job that you could work making $8
13 an hour?
14 A.  The flexible schedule was nice.
15 Q.  What else?  Tips?
16 A.  Tips are always nice, yes, sir.
17 And as I said, with my leaving management
18 the second time to go back to delivering, my
19 health issues, it was -- it was a little bit
20 less stressful on some of those.
21 Q.  Are you aware of any other jobs
22 during the time frame within the Newport
23 News area for which you were qualified that
24 had a flexible schedule that did not include
25 the use of your car?

Page 47

1 A.  I honestly don't know.  I hadn't
2 really looked into it.
3 Q.  But you got the benefit of the
4 flexible schedule that related to the driver
5 job at Papa John's?
6 A.  Well, yes, sir.
7 Q.  And you got all the tips, didn't
8 you?
9 A.  Yes, sir.
10 Q.  Papa John's didn't get a tip, did
11 it?
12 A.  No, sir.
13 Q.  I'm going to show you a document
14 that I'm marking as Exhibit 8 that I will
15 represent to you is a spreadsheet summary of
16 the reg miles contained in Exhibits 4, 5,
17 and 6 on a workweek basis Monday through
18 Sunday.  Obviously, the data -- source data
19 would be the reg miles.
20 For example, on Exhibit 1, the
21 first page, January 1, 2013, the reg miles
22 is 22.05, and the first entry in that
23 workweek is 22.05.  And on the next date
24 worked, which is January 4, 2013, the reg
25 mileage is 18.18; is that correct?

Page 48

1 A.  Yes, sir.
2 (Exhibit No. 8 was marked for
3 identification.)
4 MR. HANCOCK: Do you want to take
5 a short break or -- I'm close to being done.
6 I just want to go print off some calendars.
7 MR. BROSS: Yeah, whatever you
8 want to do.
9 (A break was taken.)
10 (Exhibit No. 9 was marked for
11 identification.)
12 BY MR. HANCOCK:
13 Q.  I'm going to attach as Exhibit 9
14 calendars for the years 2013, '14, and '15.
15 If you will, look at the January
16 2013 calendar and these checkout reports
17 starting at the top of Exhibit 4 and confirm
18 that with a Monday through Sunday workweek
19 the first entry captures all of the checkout
20 reports in that workweek.
21 Do you follow me?
22 A.  Oh, yes, sir.
23 Q.  Yeah.  So the first -- the first
24 one is January 1.  The second one is January
25 4th, and the third is January 8th.  So the

Page 49

1 third would have fallen on the next
2 workweek --
3 A.  Yes, sir.
4 Q.  -- with a Reg Mileage of 14.14.
5 That's what it's got, right?
6 A.  Yes, sir.
7 Q.  And I'm just sort of walking
8 through the record really to explain what's
9 going on.
10 MR. HANCOCK: And, Bill, we
11 batched the checkout reports by calendar.
12 Because of where the days fall in a
13 workweek, it may bleed over, but it seemed
14 easier and more logical to do the calendar
15 because everybody can think of a calendar
16 versus a workweek.  So other than those
17 year-end --
18 MR. BROSS: Yeah, where
19 they're --
20 MR. HANCOCK: It won't matter.
21 MR. BROSS: Yeah.
22 MR. HANCOCK: Yeah.
23 MR. BROSS: And again, you know,
24 this I know is a record that's prepared by
25 your staff, and we're not going to sit here

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

| Page 50 |
| --- |

1 and go over every entry and compare them.
2 But yeah.
3   **MR. HANCOCK:** Of course not, no.
4 And we have the same agreement for all of
5 these depositions.
6   **MR. BROSS:** Right.
7   **MR. HANCOCK:** I mean, I'm trying
8 to be careful not to say something it's not.
9   **MR. BROSS:** Right.
10   **BY MR. HANCOCK:**
11 Q. All right. So your best guess
12 average estimate is $35 in gas, more or
13 less?
14 A. Yes, sir.
15 Q. How many workweeks on Exhibit 8
16 did you not get at least $35 in
17 reimbursement?
18 A. It looks like there's four just
19 on the first sheet.
20 Q. And those are the first four
21 workweeks in 2013, correct?
22 A. Yes, sir.
23 Q. But each of those four workweeks,
24 you worked only two days.
25 A. Right. So my guess, as we

| Page 51 |
| --- |

1 discussed earlier, is that sometimes I would
2 work at the J. Clyde location. My guess
3 would be that there were probably shifts
4 there. These are just the checkout reports
5 from 448.
6 Q. Do you remember the store number?
7 A. 1374 springs to mind.
8 Q. Would you write -- I'll do it.
9 It doesn't matter.
10 All right. So --
11 A. I believe that was the store
12 number.
13 Q. Store 448 is Jefferson Avenue?
14 A. Yes, sir.
15 Q. And Store -- what number did you
16 say?
17 A. I believe it was 1374.
18 Q. I'll put a question mark there.
19 And that was --
20 A. J. Clyde Morris.
21 Q. J. --
22 A. J. Clyde Morris, yes, sir.
23 Q. So if you worked at the J. Clyde
24 Morris store on these weeks that show only
25 two days, the reg mileage would need to be

| Page 52 |
| --- |

1 added to these totals to get the total cash
2 reimbursement for use of your car for that
3 week -- or --
4 A. Correct.
5 Q. -- for those weeks?
6 Other than those weeks in which
7 you worked less than five days, every
8 workweek you received at least $35?
9 A. To cover just the gas for the
10 car, yes, sir, it would appear that way.
11 Q. Well, you received far in excess
12 of $35 on most weeks in which you worked
13 five days, correct?
14 A. Yes, sir.
15 Q. On Exhibit 17 -- pardon me.
16 Interrogatory 17 in Exhibit 4 --
17   **MR. BROSS:** Exhibit 7.
18 A. Sorry. Did you say 7 or 17?
19   **MR. BROSS:** 17.
20 A. 17. Okay.
21   **BY MR. HANCOCK:**
22 Q. Your discovery responses, which
23 is Exhibit 7 -- if you look at Exhibit 7,
24 your discovery responses, Interrogatory 17,
25 you say you spent $800 a year on insurance;

| Page 53 |
| --- |

1 is that correct?
2 A. I think that would be about
3 correct, yes, sir.
4 Q. And you don't know how much of
5 that would have been attributable just to
6 the Virginia minimum?
7 A. Just to the minimum? No, sir,
8 I'm not.
9 Q. No way to figure it out?
10 A. I don't believe so.
11 Q. Can anybody else tell you how
12 much you spent to own and operate your car
13 while you worked for Papa John's?
14 A. I wouldn't imagine so, no, sir.
15 Q. A stranger wouldn't know how much
16 you actually spent on your car?
17 A. No, sir.
18 Q. And in Interrogatory 13, you say
19 you had repairs done, but because
20 Interrogatory 14 is blank, you don't know
21 what, when, and how much you had with regard
22 to repairs?
23 A. I know there were a number, but I
24 don't have the receipts on hand.
25 Q. And you don't know how much you

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 014

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

---

**Page 54**

1   spent when you had them done or where you
2   had them done?
3   A.   My only thought since they would
4   have been primarily performed at Priority
5   Honda there, that they may have it on their
6   record somewhere.
7   Q.   What have you done since your
8   employment ended in June 2015?
9   A.   I have been working for Domino's
10  Pizza.
11  Q.   Are you still driving the Fit?
12  A.   Yes, sir.
13  Q.   What are you doing for Domino's?
14  A.   I deliver some days, and I am
15  also an assistant manager.
16  Q.   What's Domino's delivery
17  reimbursement?  How do they do it?
18  A.   It's calculated per mile.
19  Because the delivery screen, the list of all
20  the possible deliveries for right now,
21  their -- the computer is connected to the
22  Internet -- I believe it's MapQuest that it
23  uses -- to calculate the exact number of
24  miles per trip.
25  Q.   When you do a -- when you took a

---

**Page 55**

1   double delivery -- let's see if there's one
2   on the first page of Exhibit 4.  The second
3   delivery appears to be a double because the
4   trip time is the same; is that right?
5   A.   I suppose that -- well -- oh,
6   yes.  That does look to be about right, yes,
7   sir.
8   Q.   And is my leaning over bothering
9   you?
10  A.   Sorry?
11  Q.   Is my leaning over bothering you?
12  A.   Oh, no.
13  Q.   Some people are sensitive, and I
14  want to be sensitive, too.
15      So the checkout report on the
16  first page of Exhibit 4, the second delivery
17  address is -- can you read that for me?
18  A.   It looks to be Mashie Court.
19  Q.   770 Mashie Court?
20  A.   Yes, sir.
21  Q.   And that has a trip time of 22
22  minutes and 9 seconds.  And the second
23  delivery address is 963 Water Oak.
24      Do you know whether you would
25  have gone from the store to Mashie Court,

---

**Page 56**

1   then to Water Oak, then to the store; or
2   from the store to Water Oak, then Mashie
3   Court, and the store?  Or would you as the
4   driver have discretion to decide which --
5   A.   It would usually be driver
6   discretion, whichever way would make it a
7   quicker trip.
8   Q.   So if you did a double, you knew
9   where you were going.  Papa John's doesn't
10  care which one you go to first.  You're on
11  your own, right?
12  A.   For the most part, yes, sir.
13  Q.   I mean -- although -- I mean,
14  recognizing that Papa John's wants to
15  deliver hot and fresh and deliver good
16  product, correct?
17  A.   Correct; yes, sir.
18  Q.   And the driver benefits from that
19  because -- is it your experience that tips
20  are better with quicker deliveries?
21  A.   Usually, yes, sir.
22  Q.   Once the foot starts tapping on
23  the floor and you're wondering where the
24  pizza is, people are a little less generous
25  with tips; is that right?

---

**Page 57**

1   A.   More often than not, yes, sir.
2   Q.   It's human nature, right?
3       Yeah.
4       How were cash tips accounted for?
5   A.   At the end of the shift, it was
6   possible for the management member who was
7   clocking the driver out to type in the
8   amount of cash tips that the driver was
9   claiming.
10  Q.   If you will look at Exhibit 15
11  and 16, it looks like no cash tips were ever
12  reported on the checkout reports.
13  A.   Was it not inputted?
14  Q.   Flip through.  As a member of
15  management, you're probably more familiar
16  with checkout reports than I am.
17      Other than the middle column
18  under "Driver Net Sales," the third item
19  down, "Cash Tips," is there any other place
20  in the checkout report the cash tips would
21  be reported?
22  A.   I don't recall it.  That is
23  really odd that they would all be zeroed
24  out.
25      Oh, that's what it is.  It

---

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 015

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

Page 58

1  appears to be for each of these deliveries,
2  because it's showing a tip next to most of
3  these lines on the -- the list of
4  deliveries, the amount -- the amount paid
5  for the order, followed by discount, and
6  then tips. But I'm not sure if that would
7  have been saying that these are all credit
8  cards or not.
9  Q.  Well, just take a look at the
10  first page of Exhibit 5, the 2014 checkout
11  reports. There are six total orders.
12  A.  Correct.
13  Q.  The tips on the discrete
14  addresses list numbers that add up to
15  $17.07. Up above, under "Driver Net
16  Sales," it says, "Non-Cash Tips: 17.07."
17  A.  Yes, sir.
18  Q.  Is 17.07 what would have been
19  given to you in cash at checkout for credit
20  card receipts -- for tips on credit cards?
21  A.  Yes, sir. My only thought would
22  be that it's possible because drivers
23  could -- sorry. I'm thinking about this
24  now. It's not the same way at Domino's.
25      Drivers at Papa John's, when we

Page 59

1  logged back in from the delivery saying we
2  had returned from it, you could input the
3  amount of money that was given to you. I'm
4  not sure why it wouldn't show it as cash
5  tips then unless that's an additional cash
6  tips line.
7  Q.  Well, isn't the 17.07 the
8  additional amount -- the cash that was given
9  for -- start back.
10     If you get a cash tip, you keep
11  it in your pocket, don't you?
12  A.  Yes, sir.
13  Q.  You don't put it in that box in
14  the store, do you?
15  A.  Oh, no. Yeah, when you got back
16  to the store, you would drop all the money
17  from your pockets.
18  Q.  Okay.
19  A.  The only thing you would ever
20  want to have on you is change.
21  Q.  But when you cashed out -- opened
22  your box, went to cash -- to check out at
23  the end of the night, you kept all the cash.
24  Did you just put it in your pocket, or did
25  you put it on the table to let it get

Page 60

1  counted out?
2  A.  It would be counted out. Because
3  oftentimes if I had, you know, a number of
4  cash orders through the day, I would have
5  all the cash that customers had used to pay
6  for their entire order, and I would have
7  that until the end of my shift. So there
8  would be, more often than not, shifts where
9  in order to clock out, I would owe the store
10  X amount of money, basically paying for the
11  deliveries that I had taken that day.
12  Q.  So in essence, although not in
13  reality, when a customer orders delivery
14  pizza, you the driver are buying the
15  product --
16  A.  Yeah. Essentially, yes, sir.
17  Q.  -- taking it, getting cash or
18  credit from the customer, which should equal
19  what you're buying the pizza for, and then
20  your purchase price is paid at the end?
21  A.  Correct.
22  Q.  Yeah. So the credit card
23  transaction is easy to follow.
24  A.  Right.
25  Q.  The house -- Papa John's gets the

Page 61

1  money from the credit cards, and whatever
2  tip is on the credit card receipt is given
3  in cash to you, right?
4  A.  Right.
5  Q.  Any cash that would go for the
6  purchase of the product would go to Papa
7  John's, and that would match up with the
8  receipts and the orders, right?
9  A.  Correct.
10  Q.  All other cash is -- would be
11  cash tips that you put in your pocket?
12  A.  Yes, sir.
13  Q.  So at the end of the night, there
14  are three components of cash going into your
15  pocket: The cash tip, the credit card
16  converted tip, and then the cash for the
17  regular mileage?
18  A.  Correct.
19  Q.  Do you understand that all tips,
20  including cash tips, are taxable income?
21  A.  Yes, sir.
22  Q.  How did you report your tips to
23  the IRS?
24  A.  The cash tips? As I said, we
25  could input the -- you know, the amount paid

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 016

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

Page 62

1  because they would have -- it would have a
2  screen when we would log back in from a run
3  the amount that the customer's order was and
4  then be able to type in how much we were
5  actually given.
6  Q.  In cash?
7  A.  Whether it was -- well, if it was
8  a credit card tip, then we would input it
9  there.  If it was cash for a credit card
10 tip, then that would be claimed at the end
11 of the night -- sorry.  Rather, if they had
12 given us cash on a credit card order, then
13 it would be claimed at the end of the night.
14 Q.  And where does that cash on a
15 credit card order show up on the checkout
16 report?
17 A.  I believe that would be the cash
18 tip screen.
19 Q.  So if there's no cash tip in any
20 of these checkout reports, are you not
21 declaring any cash tips received?
22 A.  That would be I didn't declare
23 any cash tip on a credit card order, I
24 believe is how that would show on that.
25 Q.  When you got back from a run,

Page 63

1  would you enter the amount of tips received
2  for each address?
3  A.  Yes, sir.
4  Q.  And would you enter it as cash or
5  non-cash?
6  A.  It would just show a bar as, you
7  know, credit card payment that they paid,
8  say, with a MasterCard; the total amount of
9  the order; and then if they had left a tip,
10 I could input the increased amount for --
11 say an order was 24.95 and they wrote a $4
12 tip in, I would mark that in the computer as
13 28.95.
14 Q.  As a credit card tip?
15 A.  Correct.
16 Q.  Which would create a record in
17 the system for Papa John's to give you $4 in
18 cash at the end of that shift?
19 A.  Correct.
20 Q.  So if you look at page 1 of
21 Exhibit 4, the delivery to 26 Hoopes Road,
22 there is a tip of -- I keep doing this --
23 you know, I'm looking at these upside down,
24 and I keep getting 6s and 9s -- 6.09.  Would
25 you enter the tip of $6.09?

Page 64

1  A.  That would have been something I
2  typed in, yes, sir.
3  Q.  And if all of the tips entered on
4  these checkout reports adjacent to the
5  discrete addresses add up to non-cash tips,
6  then there's no record of receipt of cash
7  tips; is that correct?
8  A.  That's the way it looks on there,
9  which doesn't make any sense to me.
10 Q.  What kind of income tax
11 record-keeping do you do to record and
12 report cash tips received?
13 A.  Beyond -- I don't know if you
14 have pay stubs here.  Let me see here.
15     It has the total tips for the
16 week, and it's split into two, which would
17 make me think that it's -- one of these is
18 the credit card tips from this pay period
19 and the other would have been the cash tips
20 that I had claimed from this pay period.
21 Q.  Okay.  If you look at the second
22 page, there are two entries for each
23 category in the top left.  Two driver
24 in-store entries at the $8 an hour rate.
25 A.  Right.

Page 65

1  Q.  There's a single insider entry
2  showing you didn't work at all as an
3  insider, and then there are two entries for
4  on the road and two entries for tips.
5     Isn't it more likely true that
6  this paycheck -- pay stub, but covering a
7  two-week period -- this pay stub means that
8  the first delivery -- insider entry, the
9  first on-the-road entry, and the first tips
10 entry is for the first workweek, and the
11 second is for the second workweek?
12 A.  I do not believe so, because if
13 you'll look over here at Store 448, the
14 reimbursement page shows for that same week
15 that I only worked two days during that
16 week -- or -- yeah, during that week.  So my
17 guess would be that this was one of the
18 weeks when I worked at both 448 and 1374.
19 Q.  You've got more management
20 experience than I do.  Can we take a short
21 break and will you get down to -- deeper
22 into Exhibit 8 where you were working five
23 days at Jefferson Avenue and compare the
24 checkout reports -- see if you can reconcile
25 the checkout reports with the pay stubs?

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 017

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

---

**Page 66**

1  A.  As far as what exactly, sir?

2  Q.  Determining whether --

3  A.  Oh.  Well, it's easy to look

4  right here that -- say for -- sorry.  Let me

5  go to one of these earlier weeks.

6      Where 4/8/2013 I have five shifts

7  here at 448, I have one individual driver

8  in-store and on the road hourly.

9  Q.  Well, that's -- so what you're

10  referring to on Exhibit 8, 4/8/2013 is

11  the -- starts with the -- that's the

12  starting date of that workweek?

13  A.  Correct.

14  Q.  What you're referring to in the

15  pay stub --

16  A.  Oh, sorry.

17  Q.  -- that's the check date.

18  A.  Check date.

19  Q.  Right.

20  A.  So this would have been --

21  Q.  The calendar may help.

22  A.  Let's see here.  Which one of

23  these --

24      MR. HANCOCK: We can go off the

25  record for a second.

---

**Page 67**

1      (Off-the-record discussion.)

2      (A break was taken.)

3      MR. BROSS: We took a break just

4  to look at some things, and just for the

5  record, we've eyeballed through the checkout

6  reports of Exhibits 4, 5, and 6 for '13,

7  '14, and '15, and the overwhelming majority

8  have a reported tip on these discrete

9  deliveries.

10      BY MR. HANCOCK:

11  Q.  How do you report cash tips on

12  your federal income tax return?

13  A.  Beyond what tips were already

14  claimed since I was putting -- I was

15  inputting my cash tips -- say it was a cash

16  order.  I was putting in my total cash.

17  That was all already marked on my income

18  taxes as it's seen here with two separate

19  tip boxes.  Beyond that, if there were

20  additional cash tips, then I'm sure I was

21  making a record somewhere and had that.  I'm

22  not sure if I would have saved that with my

23  tax files or not.

24  Q.  Do you have your 2013, '14, or

25  '15 federal tax returns?

---

**Page 68**

1  A.  I don't think I have them.  I

2  filed through TurboTax, but I don't think it

3  was saved online.

4  Q.  You don't save an electronic

5  copy?

6  A.  For at least one of those years,

7  I know I was e-mailed one, but

8  unfortunately, I don't have access to the

9  e-mail account anymore.

10      MR. HANCOCK: No more questions.

11      MR. BROSS: That's all.  I don't

12  have any other questions either.

13      (The deposition concluded at

14  10:22 a.m.)

15

16

17

18

19

20

21

22

23

24

25

---

**Page 69**

1      C E R T I F I C A T E

2

3  STATE OF ALABAMA )

4  JEFFERSON COUNTY )

5

6      I hereby certify that the above

7  and foregoing deposition was taken down

8  by me in stenotype, and the questions and

9  answers thereto were reduced to computer

10  print under my supervision, and that the

11  foregoing represents a true and correct

12  transcript of the deposition given by

13  said witness upon said hearing.

14

15      I further certify that I am

16  neither of counsel nor of kin to the

17  parties to the action, nor am I in

18  anywise interested in the result of said

19  cause.

20

21      _____

22      Dana Gordon, Commissioner
        ACCR #146

23

24

25

---

**$**

$1.05 (3)
    42:7,7,17
$17.07 (1)
    58:15
$20 (1)
    44:6
$22.05 (1)
    42:14
$35 (5)
    45:3;50:12,16;
    52:8,12
$4 (8)
    28:16,17;29:9;
    30:10,13;31:2;
    63:11,17
$5 (2)
    33:3,4
$6.09 (1)
    63:25
$8 (8)
    28:13,20;30:5,9,
    9;31:5;46:12;64:24
$800 (1)
    52:25

**A**

able (3)
    22:16,17;62:4
above (1)
    58:15
absolutely (2)
    10:7;15:14
access (1)
    68:8
account (1)
    68:9
accounted (1)
    57:4
action (1)
    16:14
actual (3)
    32:23;38:18,21
actually (8)
    12:18;13:6,19;
    24:19;35:5;44:21;
    53:16;62:5
add (2)
    58:14;64:5
added (1)
    52:1
addition (2)
    29:11;32:15
additional (4)
    25:14;59:5,8;
    67:20
address (16)
    20:20;21:9,11,15,
    16;33:25;34:15,15,
    18,18,18;40:7,12;

55:17,23;63:2
addresses (4)
    21:1;37:14;
    58:14;64:5
adjacent (1)
    64:4
affirmative (2)
    41:2,4
again (4)
    29:2;33:9;34:23;
    49:23
against (1)
    30:9
agreed (3)
    5:2,19;6:1
agreement (2)
    5:5;50:4
Alabama (2)
    5:9,10
Although (3)
    34:7;56:13;60:12
always (2)
    25:25;46:16
amount (24)
    23:3;25:4,13,14,
    18;32:16;33:5;
    40:24;41:21;42:8,
    22;44:13,20;57:8;
    58:4,4;59:3,8;
    60:10;61:25;62:3;
    63:1,8,10
amounts (1)
    32:1
analogy (1)
    11:19
anymore (1)
    68:9
apologize (1)
    10:15
appear (2)
    17:8;52:10
appears (3)
    16:2;55:3;58:1
applied (1)
    14:24
appreciate (1)
    10:13
approval (5)
    19:10,21;20:1,11;
    27:3
approximate (2)
    44:13,14
area (3)
    13:25;14:1;46:23
around (4)
    9:21;14:20;
    33:17;44:6
arrived (3)
    19:7;27:7;42:15
assign (1)
    20:13
assigned (3)
    27:5,5,20

assigning (1)
    20:8
assistant (4)
    13:12,13,14;
    54:15
assumption (1)
    33:4
attach (1)
    48:13
attributable (1)
    53:5
Avenue (6)
    8:21;35:17,19;
    36:9;51:13;65:23
average (14)
    30:13,17,18;
    33:12;34:8,12,20,
    22;43:9;44:5,15;
    45:2,5;50:12
aware (1)
    46:21
away (1)
    44:7

**B**

back (23)
    9:12;10:4;14:8,
    13,19;15:22,23;
    18:17;19:6;23:17;
    27:9,14,15;31:12;
    33:8;34:23;42:1;
    46:18;59:1,9,15;
    62:2,25
baked (1)
    34:11
bar (1)
    63:6
based (4)
    21:15;32:23;
    43:8;44:22
basically (1)
    60:10
basis (1)
    47:17
basketball (1)
    41:7
batched (1)
    49:11
bears (1)
    38:17
became (2)
    15:11,16
begin (3)
    35:10;36:13,20
behind (2)
    11:25;23:20
belief (1)
    34:10
below (1)
    40:4
benefit (5)
    9:24;22:8;26:2,

13;47:3
benefits (1)
    56:18
best (5)
    44:9,10,12;45:2;
    50:11
better (2)
    10:11;56:20
Beyond (3)
    64:13;67:13,19
big (3)
    11:16;12:6;41:7
Bill (2)
    36:17;49:10
bird's-eye (1)
    18:4
bit (4)
    18:12;33:2;44:7;
    46:19
black (1)
    40:6
blacked (1)
    40:11
blank (4)
    40:18;41:3,11;
    53:20
blanks (1)
    41:17
bleed (1)
    49:13
block (1)
    37:23
born (1)
    7:20
both (2)
    9:23;65:18
bothering (2)
    55:8,11
bought (1)
    23:21
box (4)
    31:13;40:6;
    59:13,22
boxes (1)
    67:19
break (5)
    48:5,9;65:21;
    67:2,3
broken (1)
    25:16
BROSS (15)
    7:8,25;17:12;
    18:6;36:16;48:7;
    49:18,21,23;50:6,9;
    52:17,19;67:3;
    68:11
BUCHANAN (3)
    5:4;7:1,14
Buick (1)
    8:21
button (1)
    20:8
buy (1)

13;47:3
23:24
buying (2)
    60:14,19

**C**

calculate (1)
    54:23
calculated (1)
    54:18
calendar (5)
    48:16;49:11,14,
    15;66:21
calendars (1)
    4:16;48:6,14
call (2)
    21:3;22:22
called (3)
    21:4;37:24;39:12
came (6)
    14:8;19:9;19:4;
    23:16;27:20;38:5
Can (15)
    7:15;15:11;
    17:22;19:3;22:8,22;
    35:8;41:6,9;49:15;
    53:11;55:17;65:20,
    24;66:24
capacity (1)
    14:12
captures (1)
    48:19
car (14)
    8:18;9:11;21:14;
    22:14;23:8,9,16;
    26:3;32:17;46:25;
    52:2,10;53:12,16
card (14)
    32:2,13;58:20;
    60:22;61:2,15;62:8,
    9,12,15,23;63:7,14;
    64:18
cards (3)
    58:8,20;61:1
care (1)
    56:10
careful (1)
    50:8
case (1)
    5:23
cash (50)
    28:17;31:13;
    32:2,9,13,16;42:22;
    52:1;57:4,8,11,19,
    20;58:19;59:4,5,8,
    10,22,23;60:4,5,17;
    61:3,5,10,11,14,15,
    16,20,24;62:6,9,12,
    14,17,19,21,23;
    63:4,18;64:6,12,19;
    67:11,15,15,16,20
cashed (1)
    59:21

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 019

category (1)
64:23
Certified (1)
5:9
change (2)
43:14;59:20
changed (4)
43:2,6,10,12
charges (1)
25:12
check (9)
17:5,7,8,9;27:3;
31:11;59:22;66:17,
18
checked (2)
27:2;42:23
Checkout (35)
4:7,9,11;13:15;
31:19,21,22;32:7;
35:4,10;36:13,19,
23;37:15,25;42:1,3,
13,22;48:16,19;
49:11;51:4;55:15;
57:12,16,20;58:10,
19;62:15,20;64:4;
65:24,25;67:5
Cheese (5)
11:4,6,7,10;12:4
Civil (1)
5:18
claim (1)
30:8
claimed (4)
62:10,13;64:20;
67:14
claiming (1)
57:9
class (1)
16:14
clear (1)
12:2
clock (4)
19:10,14,21;60:9
clocked (1)
20:1
clocking (3)
19:5,5;57:7
close (1)
48:5
closer (3)
17:20;18:1,11
Clyde (6)
36:1,4;51:2,20,
22,23
column (3)
37:21;42:4;57:17
combine (2)
18:2;38:13
combined (1)
17:21
commission (1)
5:12
Commissioner (1)

5:10
commonality (1)
12:1
company (6)
12:5,11,19;13:8,
10;24:17
compare (2)
50:1;65:23
compensation (2)
16:20;29:7
complete (1)
11:17
component (2)
29:14;32:16
components (1)
61:14
computer (4)
29:21;33:6;
54:21;63:12
concept (2)
21:6;30:24
concluded (1)
68:13
confirm (1)
48:17
connected (1)
54:21
connection (1)
11:10
Consent (1)
4:5
consumed (1)
44:21
contain (1)
39:9
contained (1)
47:16
context (1)
12:3
convenient (1)
8:14
convert (1)
32:12
converted (1)
61:16
copies (1)
17:8
copy (1)
68:5
corner (1)
42:11
corporate (1)
11:17
counsel (2)
5:3,20
counted (2)
60:1,2
couple (3)
15:5,13,15
course (1)
50:3
Court (5)
5:9;55:18,19,25;

56:3
cover (1)
52:9
coverage (5)
23:8;24:11,14,15;
25:15
coverages (1)
25:13
covering (1)
65:6
create (1)
63:16
credit (23)
28:24;29:4,6;
30:9;32:2,12;33:1;
58:7,19,20;60:18,
22;61:1,2,15;62:8,
9,12,15,23;63:7,14;
64:18
customer (2)
60:13,18
customers (1)
60:5
customer's (1)
62:3

**D**

Dana (1)
5:8
Dana's (1)
9:24
data (3)
37:23;47:18,18
date (13)
17:5,7,9;35:11,
11;36:13,14,20,21;
47:23;66:12,17,18
dates (1)
16:3
day (11)
31:16,18;32:1,3;
36:5;37:11,19;
42:23;46:8;60:4,11
days (17)
36:7;44:23;45:5,
11,18,21,23;46:5,6;
49:12;50:24;51:25;
52:7,13;54:14;
65:15,23
debit (1)
32:13
December (2)
35:12;36:14
decide (1)
56:4
declare (1)
62:22
declaring (1)
62:21
deeper (1)
65:21
define (2)

15:6,8
definitively (1)
41:20
deliver (4)
44:21;54:14;
56:15,15
delivered (4)
13:1,3;30:1;42:9
deliveries (24)
20:9,20,22;21:1;
27:5,18,23;28:3;
29:8,12;31:25;34:5,
22;37:4,18;43:21;
44:24,25;54:20;
56:20;58:1,4;60:11;
67:9
delivering (8)
8:20,22,23;9:9,
16,18;13:21;46:18
delivery (43)
14:14;19:1,10;
20:3,4,5,7,13,19;
21:7,8,10,11,16;
27:9,10,15;28:14,
15;30:3;33:1,7,12,
20,22;34:2,14,17,
24;37:3,9,14;46:11;
54:16,19;55:1,3,16,
23;59:1;60:13;
63:21;65:8
deposition (8)
5:4,8,16,21,22;
6:4;10:17;68:13
depositions (1)
50:5
derive (1)
26:13
Determining (1)
66:2
difference (4)
30:14;31:4;41:1,
7
different (5)
13:20,22;20:14,
14,25;21:5,5;25:13
discount (1)
58:5
Discovery (7)
4:13;39:5,6,8,11;
52:22,24
discrete (9)
20:20;21:9,15,16;
37:14,18;58:13;
64:5;67:8
discretion (2)
56:4,6
discuss (1)
20:16
discussed (1)
51:1
discussion (1)
67:1
disparity (1)

16:23
distance (1)
33:12
distances (1)
44:24
distinct (1)
29:18
document (3)
16:1;39:3;47:13
Dodge (2)
23:15
Domino's (4)
54:9,13,16;58:24
done (6)
31:10;48:5;
53:19;54:1,2,7
double (7)
21:4;33:20,25;
34:17;55:1,3;56:8
double-checking (1)
35:7
doubles (1)
34:11
down (5)
15:23;25:17;
57:19;63:23;65:21
draw (1)
14:7
drill (1)
31:10
drive (6)
31:16;19:6;
22:14;23:9,13;26:9
driven (8)
25:23;34:3;35:5;
37:8,25;38:14,17,
18
driver (25)
12:24;14:14;
15:2,17,17;18:2;
19:1,11;27:3,7,8,9;
28:2;46:11;47:4;
56:4,5,18;57:7,8,
18;58:15;60:14;
64:23;66:7
drivers (6)
21:19;27:4,17,24;
58:22,25
driver's (7)
8:5,6,12,15,19;
9:11;22:2
drives (1)
27:4
driving (8)
8:19;24:4;26:14;
28:5;30:19;31:3;
43:23;54:11
drop (1)
59:16
drove (4)
21:23;23:14;
32:23;33:24
due (1)

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 020

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

15:22
duly (1)
7:2
dunk (1)
41:6
duplicate (2)
17:5,8
during (12)
23:1;30:5;32:17;
34:21;35:24,25;
38:9;44:22;45:7;
46:22;65:15,16

**E**

earlier (2)
51:1;66:5
early (1)
7:25
easier (2)
10:3;49:14
easy (2)
60:23;66:3
either (2)
5:24;68:12
elect (2)
24:9,10
electronic (1)
68:4
elevate (1)
29:9
else (3)
26:17;46:15;
53:11
e-mail (1)
68:9
e-mailed (1)
67:7
employed (1)
23:10
Employee (1)
4:4
employment (12)
12:5;15:18;16:3;
22:23,24;23:2,11;
24:5,9;38:10;45:8;
54:8
empty (2)
40:21,22
end (17)
13:4;15:18;16:2;
29:24;31:18;35:11;
36:14,21;42:23;
57:5;59:23;60:7,20;
61:13;62:10,13;
63:18
ended (3)
15:3;24:6;54:8
enter (3)
63:1,4,25
entered (1)
64:3
entire (4)

24:8;25:8;30:21;
60:6
entities (1)
11:14
entity (1)
11:18
entries (4)
64:22,24;65:3,4
entry (9)
37:24;42:11;
47:22;48:19;50:1;
65:1,8,9,10
equal (1)
60:18
essence (1)
60:12
essentially (5)
19:13;30:1;
31:23;34:3;60:16
estimate (3)
40:25;45:3;50:12
even (5)
21:11;33:1;
40:24;45:14;46:5
everybody (2)
9:4;49:15
Everyone (1)
10:15
evidence (1)
5:16
exact (4)
18:9;25:3;40:24;
54:23
Exactly (2)
8:2;66:1
EXAMINATION (3)
3:1,3;7:10
example (3)
37:5;41:5;47:20
exceeded (1)
23:4
excess (1)
52:11
exchange (1)
10:5
excuse (2)
10:21;36:15
EXHIBIT (48)
4:1,4,5,6,7,9,11,
13,14,15;15:24;
16:7,9,13;17:1,4;
35:9,14;36:10,12,
19,22;38:1,24;39:2,
19;42:5,12;43:17;
47:14,20;48:2,10,
13,17;50:15;52:15,
16,17,23,23;55:2,
16;57:10;58:10;
63:21;65:22;66:10
Exhibits (4)
36:23;38:14;
47:16;67:6
experience (2)

56:19;65:20
explain (2)
29:3;31:21;49:8
eyeballed (1)
67:5

**F**

fact (1)
44:20
fall (1)
49:12
fallen (1)
49:1
familiar (3)
13:15;30:25;
57:15
far (7)
20:2,12;27:6;
29:23;32:1;52:11;
66:1
Federal (3)
5:18;67:12,25
feel (1)
16:19
fewer (1)
45:5
field (1)
37:3
fifth (1)
40:2
figure (1)
53:9
file (1)
29:20
filed (1)
68:2
files (1)
67:23
filing (1)
5:21
filling (1)
44:6
finance (1)
24:2
fine (1)
18:7
finish (2)
10:1,2
first (26)
7:2,15;8:20;9:9;
15:5;27:7,8;30:10;
33:25;42:5,12;
47:21,22;48:19,23,
23;50:19,20;55:2,
16;56:10;58:10;
65:8,9,9,10
Fit (15)
23:12,14,22,24;
24:2,5,11,14,18,24;
25:22;26:5,9,14;
54:11
five (8)

45:11,21,23,24;
52:7,13;65:22;66:6
flexible (3)
46:14,24;47:4
Flip (1)
57:14
floor (1)
56:23
fluctuate (1)
45:12
fluctuated (1)
46:4
fluctuating (1)
43:8
folks (1)
31:11
follow (2)
48:21;60:23
followed (1)
58:5
follows (1)
7:5
foot (1)
56:22
form (3)
5:13;36:24;39:12
formalities (1)
5:6
formality (1)
5:11
forth (1)
19:6
forward (1)
18:24
four (4)
30:17;50:18,20,
23
fourth (1)
39:19
frame (1)
46:22
franchise (2)
11:7,25
franchises (1)
11:3
franchisor (2)
11:14;12:6
fresh (1)
56:15
friend (1)
13:9
full (9)
15:4,6,11;18:11;
23:8;24:10,14,15;
25:15
full-time (2)
15:16,17
fully (2)
16:20;19:14
further (2)
5:19;6:1

**G**

gas (10)
16:21;43:9,13,20,
22,25;44:20;45:3;
50:12;52:9
gave (2)
29:12;32:15
GEICO (1)
24:22
general (1)
14:1
generous (1)
56:24
gets (1)
60:25
given (8)
30:3;42:22;
58:19;59:3,8;61:2;
62:5,12
giving (1)
29:7
good (4)
16:25;28:25;
40:24;56:15
Gordon (1)
5:9
Gotcha (1)
10:19
guess (13)
20:6;25:1;29:6;
33:17;41:23;44:9,
10,12;45:2;50:11,
25;51:2;65:17

**H**

Hampton (3)
14:2,5,9
HANCOCK (20)
3:3;7:9,11;8:3;
17:14;18:14;36:17,
18;48:4,12;49:10,
20,22;50:3,7,10;
52:21;66:24;67:10;
68:10
hand (1)
53:24
happened (3)
13:4;23:18;34:2
head (1)
37:23
health (2)
15:22;46:19
hear (1)
10:4
heard (3)
10:21;11:4;30:23
help (2)
10:18;66:21
helpful (1)
10:11

Min-U-Script®
Bain & Associates Court Reporting Services, Inc.
1-888-326-0594   depos@bainandassociates.com
(72) duly - helpful

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 021

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

**helping (1)**
 10:18
**hereby (3)**
 5:2,22;6:4
**hereto (2)**
 5:24;6:2
**higher (1)**
 22:20
**highlighting (1)**
 20:5
**hit (1)**
 23:20
**holding (1)**
 14:18
**Honda (9)**
 23:12,14,21,24;
 24:2,4,24;25:22;
 54:5
**honestly (1)**
 47:1
**Hoopes (1)**
 63:21
**Hoping (1)**
 28:4
**hot (1)**
 56:15
**hour (9)**
 28:13,16,20;30:5,
 10,13;31:2;46:13;
 64:24
**hourly (3)**
 13:12;28:9;66:8
**hours (8)**
 15:7;18:1,3,10,
 15;30:17,20;45:23
**house (1)**
 60:25
**human (1)**
 57:2
**hurry (1)**
 17:15

**I**

**idea (1)**
 11:25
**identification (8)**
 15:25;16:8;17:2;
 35:15;36:11;38:25;
 48:3,11
**imagine (3)**
 30:11;45:6;53:14
**include (3)**
 21:10;33:20;
 46:24
**including (3)**
 43:22,25;61:20
**income (4)**
 61:20;64:10;
 67:12,17
**increased (1)**
 63:10
**INDEX (2)**

**3:1;4:1**
**Indicating (1)**
 32:4
**individual (2)**
 33:22;66:7
**information (2)**
 16:4;19:8
**input (8)**
 19:14;27:17,22;
 33:6;59:2;61:25;
 62:8;63:10
**inputted (1)**
 57:13
**inputting (1)**
 67:15
**inside (1)**
 12:25
**insider (1)**
 65:1,3,8
**in-store (5)**
 17:21;18:2;30:7;
 64:24;66:8
**insurance (12)**
 21:21;22:5,7,12,
 15,18,19;23:3,7;
 24:10,17;52:25
**insured (2)**
 24:17;26:11
**intended (1)**
 41:3
**intent (1)**
 16:12
**interested (1)**
 14:16
**Internet (1)**
 54:22
**interrogate (1)**
 39:15
**interrogatories (6)**
 39:16,23;40:16,
 17;41:14,18
**interrogatory (9)**
 39:13;41:6,25;
 43:16,19;52:16,24;
 53:18,20
**interrupt (1)**
 9:2
**into (9)**
 9:6;13:7;15:22;
 33:6;34:11;47:2;
 61:14;64:16;65:22
**introduced (1)**
 5:23
**IRS (1)**
 61:23
**issues (2)**
 15:23;46:19
**item (1)**
 57:18

**J**

**January (14)**

**17:6;35:11;**
 36:14,20;37:6;38:1;
 42:6,13;47:21,24;
 48:15,24,24,25
**Jefferson (5)**
 35:17,19;36:9;
 51:13;65:23
**job (2)**
 46:12;47:5
**jobs (1)**
 46:21
**John's (41)**
 9:16,19;10:21;
 11:3,16;12:3,12,17;
 13:18;14:4,9;16:3;
 18:19;21:14,24;
 23:2,17,25;24:5,13;
 26:7,19;28:11,21;
 30:6,8,14;31:3;
 32:7,12;44:22;
 46:10;47:5,10;
 53:13;56:9,14;
 58:25;60:25;61:7;
 63:17
**Join (2)**
 4:5;16:14
**July (1)**
 17:7
**June (2)**
 36:21;54:8

**K**

**keep (5)**
 16:24;38:21;
 59:10;63:22,24
**kept (3)**
 29:20;31:7;59:23
**keyed (1)**
 35:2
**kind (5)**
 8:18;46:4;64:10
**knew (1)**
 56:8
**knowledge (1)**
 8:17
**knows (1)**
 9:4

**L**

**Large (1)**
 5:11
**last (2)**
 17:7;19:18
**later (1)**
 45:15
**law (1)**
 29:3
**leaning (2)**
 55:8,11
**least (8)**
 22:3;30:13,17;

**37:17;43:7;50:16;**
 52:8;68:6
**leave (3)**
 27:8;40:21,22
**leaving (2)**
 20:17;46:17
**left (6)**
 13:8;24:22;
 41:11;42:11;63:9;
 64:23
**legal (2)**
 10:24;39:11
**legally (1)**
 26:3
**length (2)**
 46:1,3
**less (8)**
 13:8;15:9;18:13;
 33:2;46:20;50:13;
 52:7;56:24
**level (4)**
 21:20;22:4,20;
 23:5
**liability (3)**
 21:20;22:4;25:14
**license (7)**
 8:5,6,13,15,19;
 9:11;22:2
**life (2)**
 10:8;22:2
**light (1)**
 23:20
**likely (2)**
 45:3;65:5
**line (6)**
 14:8;27:4,12,13,
 14;59:6
**lines (1)**
 58:3
**list (6)**
 20:4,7;31:25;
 54:19;58:3,14
**listed (1)**
 37:14
**little (6)**
 13:8;31:12;33:2;
 44:7;46:19;56:24
**live (1)**
 7:18
**local (1)**
 43:9
**location (2)**
 36:9;51:2
**locations (2)**
 13:20,22
**log (2)**
 20:11;62:2
**logged (5)**
 28:15;29:23;
 37:8,10;59:1
**logging (1)**
 20:2
**logical (1)**

**49:14**
**log-in (2)**
 19:9,24
**long (1)**
 9:10
**look (12)**
 35:12;36:22;
 48:15;52:23;55:6;
 57:10;58:9;63:20;
 64:21;65:13;66:3;
 67:4
**looked (1)**
 47:2
**looking (4)**
 17:18;41:10;
 43:16;63:23
**looks (9)**
 16:6;17:17,20,25;
 39:4;50:18;55:18;
 57:11;64:8
**lot (4)**
 10:3;11:19;28:8;
 31:11
**Louisville (1)**
 11:15
**lower (1)**
 29:9

**M**

**maintain (4)**
 22:3,19;24:9,10
**Maintenance (2)**
 4:4;16:25
**majority (2)**
 20:15;67:7
**makes (2)**
 10:3;40:14
**makeup (1)**
 30:24
**making (2)**
 46:12;67:21
**management (12)**
 13:7;14:16;
 15:22;20:11;27:3;
 28:1;29:24;43:8;
 46:17;57:6,15;
 65:19
**manager (8)**
 19:10,13,21,25;
 20:12;31:23;37:8;
 54:15
**managing (2)**
 13:6,11
**manner (1)**
 5:24
**many (2)**
 45:23;50:15
**MapQuest (1)**
 54:22
**mark (3)**
 35:9;51:18;63:12
**marked (13)**

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 022

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

15:24;16:7;17:1,
4;35:14;36:10,12;
38:24;39:2;41:13;
48:2,10;67:17
**market (1)**
14:5
**marking (1)**
47:14
**married (2)**
26:23,25
**Mashie (4)**
55:18,19,25;56:2
**MasterCard (1)**
63:8
**match (1)**
61:7
**math (1)**
18:3
**matter (1)**
15:12;49:20;51:9
**may (10)**
5:8,15,16,22;
14:20;34:21;36:6;
49:13;54:5;66:21
**maybe (4)**
14:20;15:21;
19:18;33:15
**McDonald's (1)**
11:20
**mean (9)**
8:23;17:17;18:8,
12;19:12;28:8;
50:7;56:13,13
**meaning (1)**
28:14
**means (1)**
65:7
**Member (8)**
4:7,9,11;32:7;
35:4,10;57:6,14
**middle (2)**
37:21;57:17
**midnight (1)**
46:7
**might (1)**
31:24
**mile (2)**
33:19;54:18
**mileage (21)**
16:20;29:13,14,
17;30:3;32:19,22,
23;33:5;42:4,6,11,
14,17,21;43:2;44:8;
47:25;49:4;51:25;
61:17
**miles (27)**
29:25;33:1,7,8,
10,21;34:1,4,4,22,
23;35:1,5;37:2,7,9,
10,24;38:2,14,17,
18,21;47:16,19,21;
54:24
**mind (2)**

11:9;51:7
**mindful (3)**
9:24;10:12,18
**mine (1)**
13:9
**minimal (1)**
21:20
**minimally (1)**
26:11
**minimum (9)**
21:20;22:4;23:4;
25:8,14;29:10;
30:24;53:6,7
**minutes (1)**
55:22
**Monday (4)**
18:19,21;47:17;
48:18
**money (7)**
32:1,16,22;59:3,
16;60:10;61:1
**month (2)**
43:11,14
**months (6)**
15:5,13,15,21;
25:5;43:12
**more (13)**
10:10;18:4;20:9;
28:4;33:2;49:14;
50:12;57:1,15;60:8;
65:5,19;68:10
**Morris (4)**
36:2;51:20,22,24
**most (5)**
24:19;41:24;
52:12;56:12;58:2
**motor (1)**
22:8
**moving (1)**
27:12
**much (9)**
25:7;29:21;
43:20;53:4,12,15,
21,25;62:4
**multiplied (1)**
42:17
**multiplier (4)**
38:2,6,8,12
**myself (1)**
10:10

**N**

**N/A (1)**
41:13
**name (9)**
7:12,15;11:2,24;
12:12;20:6;31:15;
39:20;40:5
**NATHANAEL (3)**
5:4;7:1,14
**N-A-T-H-A-N-A-E-L (1)**
7:16

**Nationwide (2)**
24:21;25:12
**nature (1)**
57:2
**need (4)**
5:14;9:24;10:17;
51:25
**needed (3)**
19:21,25;22:12
**neighbor (1)**
34:3
**Neon (2)**
23:16,18
**Net (2)**
57:18;58:15
**Newport (5)**
7:19;13:25;14:2;
35:18;46:22
**News (5)**
7:19;13:25;14:2;
35:18;46:23
**next (5)**
27:10,10;47:23;
49:1;58:2
**next-door (1)**
34:2
**nice (2)**
46:14,16
**nicknames (1)**
21:6
**night (4)**
59:23;61:13;
62:11,13
**nine (2)**
13:19,24
**Non-Cash (3)**
58:16;63:5;64:5
**normal (1)**
45:9
**normally (2)**
21:4;32:25
**Nos (1)**
36:10
**number (24)**
18:10,15;19:9;
29:25;33:19;34:12,
23;35:6;37:4;38:6;
40:13,16;42:15;
43:11;44:4,23,23;
45:17;51:6,12,15;
53:23;54:23;60:3
**numbers (1)**
58:14

**O**

**Oak (3)**
55:23;56:1,2
**oath (1)**
41:18
**objections (2)**
5:12,13
**Obviously (1)**

47:18
**occasional (1)**
33:20
**odd (1)**
57:23
**off (2)**
48:6;66:24
**offered (1)**
5:16
**Off-the-record (1)**
67:1
**often (2)**
57:1;60:8
**oftentimes (1)**
60:3
**old (1)**
8:10
**Once (3)**
15:16;19:4;56:22
**one (17)**
10:16;11:2;
25:18;27:10;36:7;
46:8;48:24,24;55:1;
56:10;64:17;65:17;
66:5,7,22;68:6,7
**ones (2)**
41:11,12
**online (1)**
68:3
**only (8)**
38:2;41:12;
50:24;51:24;54:3;
58:21;59:19;65:15
**on-the-road (1)**
18:3;65:9
**onward (1)**
13:21
**open (1)**
45:13
**opened (1)**
59:21
**operable (1)**
26:3
**operate (3)**
11:21;22:8;53:12
**order (14)**
20:11;22:11;
27:20;42:9;58:5;
60:6,9;62:3,12,15,
23;63:9,11;67:16
**orders (12)**
35:6;37:6,13,18;
38:3,9,13;42:16;
58:11;60:4,13;61:8
**ordinary (1)**
10:8
**otherwise (1)**
18:24
**out (19)**
19:5;20:3,6,11;
25:9,12;27:21;
28:15;31:11;40:11;
42:23;53:9;57:7,24;

59:21,22;60:1,2,9
**outside (1)**
21:24
**oven (1)**
27:21
**over (8)**
9:25;37:7;44:15;
49:13;50:1;55:8,11;
65:13
**overall (1)**
29:19
**overwhelming (1)**
67:7
**owe (1)**
60:9
**own (3)**
11:21;53:12;
56:11

**P**

**PAGE (16)**
3:2;4:2;12:15;
35:6;37:22;39:19;
40:2;42:5,12;47:21;
55:2,16;58:10;
63:20;64:22;65:14
**paid (2)**
16:15,17,18;25:5,
11,17;28:15;42:8;
58:4;60:20;61:25;
63:7
**Papa (41)**
9:16,19;10:21;
11:3,16;12:3,12,17;
13:18;14:4,9;16:3;
18:18;21:14,23;
23:2,17,25;24:5,13;
26:6,18;28:10,21;
30:6,8,14;31:3;
32:6,12;44:21;
46:10;47:5,10;
53:13;56:9,14;
58:25;60:25;61:6;
63:17
**pardon (1)**
52:15
**Park (1)**
8:21
**parlance (1)**
14:4
**part (2)**
15:8;56:12
**parties (3)**
5:3,21;6:2
**part-time (2)**
14:24;15:1
**party (1)**
5:24
**password (3)**
19:9,14;20:12
**Pay (13)**
4:6;17:5;29:9,15;

40:11;60:5;64:14,
  18,20;65:6,7,25;
  66:15
paycheck (2)
  28:18;65:6
paying (3)
  16:20;25:2;60:10
payment (3)
  29:17;32:16;63:7
payments (2)
  32:2,2
payroll (2)
  29:18,19
PDF (1)
  39:25
people (6)
  20:14,15,24;21:5;
  55:13;56:24
per (8)
  21:15;30:2;33:1;
  37:9;42:8;43:20;
  54:18,24
percent (3)
  33:16,16,18
performed (1)
  54:4
period (9)
  18:25;22:23;
  24:9;25:3;35:24,25;
  64:18,20;65:7
periods (1)
  36:7
person (1)
  10:17
personal (1)
  26:13
Personally (1)
  26:15
phrases (1)
  20:15
picking (1)
  20:6
Pizza (4)
  54:10;56:24;
  60:14,19
PJ (9)
  10:21;11:1,4,6,7,
  10,11;12:4,4
place (1)
  57:19
play (1)
  10:4
please (1)
  7:13
plenty (1)
  27:24
pm (5)
  45:14,16,16,18,
  19
pocket (4)
  59:11,24;61:11,
  15
pockets (1)

59:17
point (2)
  22:1;36:3
polite (1)
  10:11
posed (1)
  43:18
position (1)
  14:16
possible (8)
  18:8;25:16;36:1;
  43:13,15;54:20;
  57:6;58:22
possibly (1)
  21:10
post (1)
  18:25
Predominantly (1)
  21:7;35:20
premium (3)
  24:23;25:9,11
prepared (1)
  49:24
press (1)
  20:8
pretty (3)
  15:3,11;28:25
price (2)
  43:13;60:20
prices (1)
  43:9
primarily (5)
  13:22;27:25;
  36:8;40:22;54:4
print (1)
  48:6
printed (1)
  40:5
Priority (1)
  54:4
privacy (1)
  40:7
probably (5)
  9:4;41:24;44:18;
  51:3;57:15
procedural (1)
  5:7
Procedure (2)
  5:18;19:3
process (5)
  20:2,17;31:19,21,
  22
product (3)
  56:16;60:15;61:6
professionally (1)
  26:15
progress (1)
  31:16
provide (1)
  41:19
provided (3)
  5:17,25;12:5
pull (1)

31:23
pulling (1)
  19:23
purchase (5)
  23:3,7;24:14;
  60:20;61:6
purchased (1)
  22:7
purpose (2)
  5:17;44:1
purposes (2)
  37:17;40:8
pursuant (1)
  5:5
put (7)
  29:24;31:13;
  51:18;59:13,24,25;
  61:11
putting (4)
  19:24;20:7;
  67:14,16

Q

qualified (1)
  46:23
quicker (2)
  56:7,20
quickly (1)
  15:3
quiz (1)
  29:2
quote (1)
  28:17

R

range (1)
  17:6
ranges (1)
  17:9
rate (10)
  21:16;28:9;29:9;
  30:5,9;42:5,6,17;
  43:2;64:24
rather (2)
  46:11;62:11
read (1)
  55:17
readers (1)
  19:23
reality (1)
  60:13
really (5)
  27:19;34:7;47:2;
  49:8;57:23
reason (1)
  12:11
reasonable (1)
  41:22
recall (4)
  18:9;19:20;
  40:20;57:22

receipt (2)
  61:2;64:6
receipts (4)
  31:13;53:24;
  58:20;61:8
received (8)
  21:13;30:10;
  31:2;52:8,11;62:21;
  63:1;64:12
recognition (1)
  19:20
recognize (1)
  39:3
recognizing (2)
  34:20;56:14
reconcile (1)
  65:24
record (14)
  7:13;9:7;17:11;
  29:3;37:13;49:8,24;
  54:6;63:16;64:6,11;
  66:25;67:5,21
record-keeping (1)
  64:11
records (2)
  16:22,25
red (1)
  23:20
redact (1)
  40:7
refer (2)
  12:3;20:24
reference (1)
  37:12
referred (1)
  14:5
referring (4)
  12:4;32:6;66:10,
  14
reflect (1)
  16:2
Reg (9)
  42:10,13,21;
  47:16,19,21,24;
  49:4;51:25
regard (2)
  40:15;53:21
regardless (1)
  26:6
register (1)
  26:5
registered (3)
  25:22,25;26:10
regular (3)
  14:24;15:2;61:17
rehired (1)
  13:10
reimburse (1)
  42:24
Reimbursement (5)
  21:13;50:17;
  52:2;54:17;65:14
related (1)

47:4
relation (1)
  25:8;38:18
remain (2)
  15:10,17
remember (4)
  17:18;18:6;
  40:24;51:6
repairs (2)
  53:19,22
rephrase (1)
  22:21
Report (11)
  32:7;35:4;37:15,
  25;42:13;55:15;
  57:20;61:22;62:16;
  64:12;67:11
reported (3)
  57:12,21;67:8
Reporter (2)
  5:9;7:6
Reports (22)
  4:8,10,12;13:15;
  35:10;36:13,19,23;
  42:2,4;48:16,20;
  49:11;51:4;57:12,
  16;58:11;62:20;
  64:4;65:24,25;67:6
represent (2)
  17:4;47:15
representing (2)
  5:3,20
request (1)
  39:12
Requests (4)
  4:13;39:5,6,8
require (2)
  21:19;24:13
required (1)
  22:4
requirements (1)
  5:7
reserved (1)
  5:15
respect (1)
  5:6
response (2)
  40:19;41:19
responses (3)
  39:22;52:22,24
restrict (1)
  18:23
retained (1)
  31:7
return (1)
  67:12
returned (1)
  59:2
returning (1)
  20:18
returns (1)
  67:25
revoked (1)

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594   depos@bainandassociates.com

(75) paycheck - revoked

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

8:16
**right (40)**
10:20;11:19;
12:21;14:7,21;
22:15;28:18;29:18;
31:8;32:21;33:23;
34:8;35:3,7,8;
36:25;39:15,17;
42:3;44:1;45:24;
49:5;50:6,9,11,25;
51:10;54:20;55:4,6;
56:11,25;57:2;
60:24;61:3,4,8;
64:25;66:4,19
**road (7)**
11:22;17:22;
28:14;30:20;63:21;
65:4;66:8
**Roads (2)**
14:5,9
**rotation (1)**
27:6
**roughly (1)**
33:14
**Rules (1)**
5:18
**ruling (1)**
5:15
**run (10)**
20:10,16,19,25;
21:8;27:23;31:12;
34:21;62:2,25
**runs (2)**
20:5,22

**S**

**salaried (2)**
13:13,14
**Sales (2)**
57:18;58:16
**same (13)**
9:15;11:24;
12:15;13:18;17:18;
21:6;36:24;45:24;
46:5;50:4;55:4;
58:24;65:14
**save (1)**
68:4
**saved (3)**
29:22;67:22;68:3
**saying (4)**
30:1;33:3;58:7;
59:1
**schedule (4)**
45:10;46:14,24;
47:4
**school (1)**
26:21
**scolding (2)**
10:9,10
**screen (6)**
19:24;20:4;

31:23;54:19;62:2,
18
**second (22)**
21:10;22:22,23;
23:1,10;26:18;
28:10,21;30:6;34:1;
37:23;38:9;45:7;
46:18;48:24;55:2,
16,22;64:21;65:11,
11;66:25
**seconds (1)**
55:22
**Security (1)**
40:12
**seem (1)**
16:5
**seemed (2)**
44:8;49:13
**segregated (1)**
25:9
**sense (4)**
10:24;12:7;
40:14;64:9
**sensitive (2)**
55:13,14
**separate (4)**
11:14;25:12;
29:17;67:18
**separated (1)**
25:21
**sheet (2)**
37:6;50:19
**shift (13)**
19:8,15;29:24;
30:2,21;32:17;42:9,
24;46:2,3;57:5;
60:7;63:18
**shifts (4)**
45:24;51:3;60:8;
66:6
**short (6)**
13:1,4,5;15:19;
48:5;65:20
**show (12)**
16:1,23;17:3;
27:13;35:8;39:1;
47:13;51:24;59:4;
62:15,24;63:6
**showing (3)**
31:24;58:2;65:2
**shows (2)**
37:3;65:14
**side (1)**
11:21
**signature (3)**
6:3;16:9;40:3
**signed (1)**
16:13
**simply (2)**
19:23;20:3
**single (6)**
20:19;21:8,9;
34:14,21;65:1

**sit (1)**
49:25
**sitting (1)**
23:19
**six (2)**
25:5;58:11
**six-month (1)**
25:2
**smaller (1)**
45:4
**Social (1)**
40:12
**somebody (1)**
41:5
**someone (1)**
23:20
**sometimes (2)**
21:9;51:1
**somewhere (4)**
25:17;33:17;
54:6;67:21
**soon (1)**
15:11
**Sorry (12)**
7:24;10:14;
17:13,24;25:10;
34:13;52:18;55:10;
58:23;62:11;66:4,
16
**sort (2)**
34:11;49:7
**sound (1)**
14:21
**sounds (1)**
30:25
**source (1)**
47:18
**speak (1)**
7:3
**spell (1)**
7:15
**spent (6)**
43:20;45:3;
52:25;53:12,16;
54:1
**split (1)**
64:16
**spreadsheet (1)**
47:15
**springs (1)**
51:7
**staff (1)**
49:25
**standard (1)**
38:3
**start (2)**
8:18;59:9
**started (8)**
8:20;9:9,14,18;
12:16,19;13:6;16:4
**starting (3)**
16:2;48:17;66:12
**starts (2)**

56:22;66:11
**State (4)**
5:10;7:12;22:9;
23:4
**stated (1)**
18:25
**Statute (1)**
5:25
**still (2)**
24:4;54:11
**stint (9)**
22:23;23:1,10;
26:18;28:10,21;
30:6;38:9;45:7
**stipulated (3)**
5:2,19;6:1
**stipulation (1)**
5:5
**STIPULATIONS (2)**
5:1;7:7
**store (25)**
11:21;13:17,18;
20:17,18;27:8;
28:13;34:1;35:16,
19,20;36:2;51:6,11,
13,15,24;55:25;
56:1,2,3;59:14,16;
60:9;65:13
**stores (2)**
13:24;35:24
**stranger (1)**
53:15
**stressful (1)**
46:20
**stretch (1)**
15:19
**stretches (1)**
36:8
**strike (1)**
22:20
**stub (4)**
29:15;65:6,7;
66:15
**Stubs (6)**
4:6;17:5,9;40:11;
64:14;65:25
**suggest (1)**
28:2
**suggested (1)**
27:25
**Summary (2)**
4:14;47:15
**Sunday (4)**
18:20,21;47:18;
48:18
**suppose (1)**
55:5
**supposed (1)**
43:10
**Sure (15)**
7:9;9:15;12:14;
18:12;19:2;22:25;
25:3,20;27:24;

41:12;45:17;58:6;
59:4;67:20,22
**suspended (1)**
8:16
**switched (3)**
19:19,22;24:22
**sworn (1)**
7:3
**system (1)**
63:17

**T**

**table (1)**
59:25
**talk (2)**
9:25;10:8
**talked (1)**
20:16
**talking (2)**
9:15;30:18
**tapping (1)**
56:22
**tax (4)**
64:10;67:12,23,
25
**taxable (1)**
61:20
**taxes (1)**
67:18
**Team (6)**
4:7,9,11;32:7;
35:4,10
**term (1)**
30:25
**terms (1)**
19:5
**test (1)**
18:4
**testified (1)**
7:4
**thinking (2)**
20:21;58:23
**third (5)**
21:11;37:22;
48:25;49:1;57:18
**though (1)**
45:12
**thought (3)**
18:11;54:3;58:21
**three (2)**
15:21;61:14
**three-year (2)**
35:24,25
**throughout (3)**
24:8;28:21;44:8
**thumb (1)**
17:22
**thumbing (1)**
17:19
**thumbprint (4)**
19:16,20,23,24
**till (1)**

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 025

8:8
times (3)
   11:20;38:3;42:18
tip (21)
   28:23;29:4,6;
   47:10;58:2;59:10;
   61:2,15,16;62:8,10,
   18,19,23;63:9,12,
   14,22,25;67:8,19
tips (46)
   28:4,5;30:10,13,
   17,18;31:2,8;32:10,
   13;46:15,16;47:7;
   56:19,25;57:4,8,11,
   19,20;58:6,13,16,
   20;59:5,6;61:11,19,
   20,22,24;62:21;
   63:1;64:3,5,7,12,15,
   18,19;65:4,9;67:11,
   13,15,20
told (2)
   30:15;43:7
took (4)
   33:7;44:7;54:25;
   67:3
top (6)
   35:6;37:22;42:3,
   11;48:17;64:23
total (25)
   32:1;33:10;
   34:23;35:4,6;37:4,
   6,7,13,13,18,18,24;
   38:1,3,9,13,14,17;
   42:16;52:1;58:11;
   63:8;64:15;67:16
totaled (1)
   23:19
totals (1)
   52:1
trade (1)
   12:12
transaction (1)
   60:23
traveled (1)
   37:10
trial (1)
   5:23
trick (1)
   17:10
tried (1)
   40:20
trip (4)
   54:24;55:4,21;
   56:7
trouble (1)
   10:25
true (1)
   65:5
truth (3)
   7:3,3,4
try (3)
   10:1,2;29:8
trying (4)

9:5,25;15:20;
   50:7
TurboTax (1)
   68:2
turned (3)
   7:22;8:11;12:21
twice (1)
   44:6
two (21)
   11:13;13:22;
   15:21;19:18;20:9,
   20,25;27:23;28:2;
   36:5,7;41:13;50:24;
   51:25;64:16,22,23;
   65:3,4,15;67:18
two-pie (2)
   20:25;21:3
two-week (1)
   65:7
type (5)
   10:3;19:8;39:22;
   57:7;62:4
typed (3)
   9:6;39:20;64:2
typical (2)
   46:1,3
typically (1)
   45:20

U

under (3)
   41:18;57:18;
   58:15
Unfortunately (2)
   16:24;68:8
United (4)
   10:22;11:1,11;
   12:4
Unless (5)
   12:2;18:24;
   22:14;26:10;59:5
up (19)
   15:4;18:17;
   19:23;27:11,13,25;
   29:9;30:14;31:4,23;
   38:5,13;44:3,6;
   58:14,15;61:7;
   62:15;64:5
upkeep (1)
   16:21
upside (1)
   63:23
use (9)
   11:19,24;19:16;
   20:14;21:14;32:17;
   42:24;46:25;52:2
used (4)
   5:17,23;38:8;
   60:5
uses (2)
   12:12;54:23
using (1)

20:12
Usual (1)
   7:6
usually (2)
   27:20;28:7;36:6;
   38:23;56:5,21

V

vary (3)
   34:15,18;44:22
vast (1)
   20:15
vehicle (3)
   16:21;22:9;42:25
versus (1)
   49:16
view (1)
   18:4
Virginia (14)
   7:19;12:6;21:19,
   22,24;22:4,9;23:4;
   25:7,23;26:3,10,14;
   53:6

W

wage (5)
   28:9;29:10;30:5,
   9,24
wages (2)
   16:15,16
waited (1)
   8:8
waived (5)
   5:7,22;6:4
walking (1)
   49:7
wants (1)
   56:14
Water (3)
   55:23;56:1,2
way (8)
   10:8;20:21;
   25:21;52:10;53:9;
   56:6;58:24;64:8
week (17)
   15:7;18:1,16;
   30:16;36:7;43:21;
   44:7;8;45:11,21;
   46:5,8;52:3;64:16;
   65:14,16,16
weeks (11)
   17:21;18:9,12;
   45:13,15;51:24;
   52:5,6,12;65:18;
   66:5
what's (3)
   43:17;49:8;54:16
wherever (1)
   11:15
whichever (1)
   56:6

whole (2)
   7:3;11:25
Williamsburg (1)
   14:3
within (7)
   15:4,12,13,14;
   20:18;33:15;46:22
without (2)
   5:11;22:18
witness (4)
   6:3,3;7:2;8:2
wondering (1)
   56:23
word (4)
   10:6,6,7,7
work (27)
   13:9,17,18;14:8,
   13;15:1;19:4;22:12,
   13,14,17,18;23:17;
   26:17;27:13;31:16;
   35:23;43:23;45:10,
   13,15,20;46:6,10,
   12;51:2;65:2
worked (26)
   11:8;12:12,25;
   13:20;14:23;18:10;
   26:6;34:8;35:20;
   36:1,4;44:17,23;
   45:4,11,18;46:7,8;
   47:24;50:24;51:23;
   52:7,12;53:13;
   65:15,18
working (12)
   12:16,19,23;
   17:20,25;18:7;19:1;
   26:18;28:10;46:11;
   54:9;65:22
workweek (15)
   18:19;30:12;
   31:3;44:22;47:17,
   23;48:18,20;49:2,
   13,16;52:8;65:10,
   11;66:12
workweeks (5)
   44:16;45:4;
   50:15,21,23
world (1)
   39:11
writable (1)
   39:25
write (1)
   51:8
wrong (1)
   10:25
wrote (1)
   63:11

Y

year (5)
   7:20;8:4;13:7;
   19:18;52:25
year-end (1)

49:17
years (4)
   19:18;45:8;
   48:14;68:6

Z

zeroed (1)
   57:23

1

1 (11)
   4:4;15:24;35:11;
   36:14;38:1;42:6,13;
   47:20,21;48:24;
   63:20
1.05 (1)
   42:18
10 (6)
   33:15,17;34:4;
   41:25;43:16,19
10:22 (1)
   68:14
105 (2)
   37:10;38:2
11:00 (1)
   45:16
12:00 (1)
   45:16
13 (4)
   17:7;36:15;
   53:18;67:6
1374 (3)
   51:7,17;65:18
14 (11)
   4:15;17:6;35:21;
   36:15,16;44:16;
   45:9;48:14;53:20;
   67:7,24
14.14 (1)
   49:4
15 (9)
   4:4,15;35:21;
   44:16;45:9;48:14;
   57:10;67:7,25
16 (4)
   4:5;7:22;8:13;
   57:11
17 (8)
   4:6;12:22;52:15,
   16,18,19,20,24
17.07 (3)
   58:16,18;59:7
18 (1)
   8:11
18.18 (1)
   47:25
19 (1)
   12:20
1989 (1)
   7:21
1990 (1)

Case 7:15-cv-00955-LSC   Document 183-25   Filed 01/12/18   Page 27 of 28

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 026

James Sullivan, et al. vs
PJ United, Inc., et al

Nathanael Buchanan
August 01, 2017

| | | |
|---|---|---|
| 8:21 | 4:13 | 50:15;65:22;66:10 |
| **1st (1)** | | **8:00 (2)** |
| 37:6 | **4** | 45:19;46:8 |
| | | **8th (1)** |
| **2** | **4 (16)** | 48:25 |
| | 4:7;35:9,14; | |
| **2 (7)** | 36:23;38:1,14;42:5, | **9** |
| 4:5;16:7,10,13; | 12;47:16,24;48:17; | |
| 34:4,21;36:20 | 52:16;55:2,16; | **9 (4)** |
| **2.4 (2)** | 63:21;67:6 | 4:15;48:10,13; |
| 33:24;34:1 | **4.8 (1)** | 55:22 |
| **2005 (2)** | 34:4 | **9:30 (2)** |
| 7:23;23:15 | **4.9 (1)** | 45:14;46:6 |
| **2006 (2)** | 34:4 | **963 (1)** |
| 12:18,21 | **4/8/2013 (2)** | 55:23 |
| **2008 (7)** | 66:6,10 | **9s (1)** |
| 8:7;9:12,21,22; | **4:00 (2)** | 63:24 |
| 12:17;13:2;23:12 | 45:18;46:8 | |
| **2010 (6)** | **40 (1)** | |
| 13:10,21;14:8,20; | 15:7 | |
| 16:4;18:25 | **448 (6)** | |
| **2012 (1)** | 35:16;51:5,13; | |
| 38:1 | 65:13,18;66:7 | |
| **2013 (16)** | **48 (2)** | |
| 4:15;15:20;17:6; | 4:14,15 | |
| 35:11,12,20;42:6, | **4th (1)** | |
| 13;44:16;45:9; | 48:25 | |
| 47:21,24;48:14,16; | | |
| 50:21;67:24 | **5** | |
| **2014 (2)** | | |
| 36:14;58:10 | **5 (24)** | |
| **2015 (5)** | 4:9;33:1,7,8,10, | |
| 17:7;36:15,20,21; | 16,19,21;34:22; | |
| 54:8 | 35:1;36:10,12,23; | |
| **21 (5)** | 37:2,9;38:3,3,6,8, | |
| 37:7,13;41:14; | 12,14;47:16;58:10; | |
| 42:17,18 | 67:6 | |
| **22 (4)** | **5:00 (4)** | |
| 39:9,16;41:15; | 45:14,16;46:6,7 | |
| 55:21 | | |
| **22.05 (3)** | **6** | |
| 42:18;47:22,23 | | |
| **24.95 (1)** | **6 (7)** | |
| 63:11 | 4:11;36:10,19,24; | |
| **25 (2)** | 38:15;47:17;67:6 | |
| 17:21;18:1 | **6.09 (1)** | |
| **26 (2)** | 63:24 | |
| 17:21;63:21 | **6s (1)** | |
| **28.95 (1)** | 63:24 | |
| 63:13 | | |
| | **7** | |
| **3** | | |
| | **7 (10)** | |
| **3 (4)** | 3:3;4:13;38:24; | |
| 4:6;17:1,4;36:23 | 39:2,19;43:17; | |
| **30 (3)** | 52:17,18,23,23 | |
| 18:1;35:12;36:21 | **770 (1)** | |
| **35 (5)** | 55:19 | |
| 4:7;15:7;44:4,10, | | |
| 13 | **8** | |
| **36 (2)** | | |
| 4:9,11 | **8 (6)** | |
| **38 (1)** | 4:14;47:14;48:2; | |

Sullivan v. PJ United, et al. 7:13-cv-01275
Exhibit 22, page 027